[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14552

_____

D.C. Docket No. 4:18-cv-00262-MW-CAS

NANCY CAROLA JACOBSON,
TERENCE FLEMING, et al.,

Plaintiffs-Appellees,

versus

FLORIDA SECRETARY OF STATE,
NATIONAL REPUBLICAN SENATORIAL COMMITTEE, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(September 3, 2020)

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR and LUCK, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

We vacate our original opinion in this appeal and substitute in its place the following opinion.

This appeal requires us to decide whether several voters and organizations may challenge in federal court a law that governs the order in which candidates appear on the ballot in Florida's general elections. The law provides that candidates of the party that won the last gubernatorial election shall appear first for each office on the ballot and that candidates of the second-place party shall appear second. Several Democratic voters and organizations sued the Florida Secretary of State to enjoin enforcement of the law. They alleged that the law violates their rights under the First and Fourteenth Amendments because candidates who appear first on the ballot—in recent years, Republicans—enjoy a "windfall vote" from a small number of voters who select the first candidate on a ballot solely because of that candidate's position of primacy. After a bench trial, the district court permanently enjoined the Secretary—and the 67 county Supervisors of Elections, none of whom were made parties to this lawsuit—from preparing ballots in accordance with the law.

We hold that the voters and organizations lack standing to sue the Secretary. None of them proved an injury in fact. And any injury they might suffer is neither fairly traceable to the Secretary nor redressable by a judgment against her because she does not enforce the challenged law. Instead, the Supervisors—county officials

independent of the Secretary—are responsible for placing candidates on the ballot in the order the law prescribes. The district court lacked authority to enjoin those officials in this suit, so it was powerless to provide redress.

We also hold alternatively that the voters and organizations' complaint presents a nonjusticiable political question. Complaints of unfair partisan advantage based on the order in which candidates appear on the ballot bear all the hallmarks of a political question outside our competence to resolve. *See Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). No judicially discernable and manageable standards exist to determine what constitutes a "fair" allocation of the top ballot position, and picking among the competing visions of fairness "poses basic questions that are political, not legal." *Id.* at 2500. And even if courts could agree on a standard for fairly ordering ballots, no objective measures exist to identify violations of that standard. *See id.* at 2501. This lawsuit asks us "to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct" our decision. *Id.* at 2507. That kind of complaint is "outside the courts' competence and therefore beyond the courts' jurisdiction." *Id.* at 2494.

Because the voters and organizations lack standing and their complaint is nonjusticiable, we vacate and remand with instructions to dismiss for lack of jurisdiction.

## I. BACKGROUND

As part of a comprehensive revision to the election code, the Florida Legislature enacted a statute in 1951 that governs the order in which candidates appear on the ballot in general elections. 1951 Fla. Laws 871 (originally codified at Fla. Stat. § 101.151(4) (1951)). The statute requires the candidate of the party that won the last gubernatorial election to appear first beneath each office listed on the ballot, with the candidate of the second-place party appearing second. Fla. Stat. § 101.151(3)(a). In the nearly 70 years since its enactment, the statute has placed Democrats first on the ballot in 20 general elections and Republicans first in 14, including the 10 most recent general elections.

In 2018, three voters and six organizations that support the Democratic Party filed a complaint against the Florida Secretary of State to enjoin enforcement of the statute. They alleged that, because of "position bias," the statute confers "an unfair electoral advantage" on Republicans, who have held the Governorship for the past 20 years and whose candidates have appeared first on the ballot during that time. Position bias, or the "primacy effect," refers to the phenomenon that a small number of voters select the candidate who is listed first for an office on the ballot solely because of the candidate's position. In close elections, the complaint alleged, the primacy effect can give Republican candidates the "bump" needed to secure victory. By awarding the benefits of the primacy effect entirely to

4

Republican candidates in recent years, the voters and organizations argued that the statute violates their rights under the First and Fourteenth Amendments as interpreted in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).

Shortly after the voters and organizations filed their complaint, the National Republican Senatorial Committee and Republican Governors Association moved to intervene as defendants. *See* Fed. R. Civ. P. 24(b). The district court granted the motion. The Republican intervenors joined the Secretary in defending the challenged law as constitutional and opposing the relief the voters and organizations sought.

At a bench trial, the voters and organizations presented the testimony of three expert witnesses. Jon Krosnick, a professor at Stanford University, reviewed the academic literature and testified that the existence of the primacy effect is well-established by academic studies of elections. Based on his regression analyses of past Florida elections, Krosnick testified that candidates listed first on Florida ballots have historically gained an average advantage of about five percentage points. Jonathan Rodden, also a professor at Stanford University, testified about the primacy effect in down-ballot races. Rodden testified that the primacy effect is more pronounced in down-ballot races, where voters often have less information about the candidates, than in top-of-ticket races. And Paul Herrnson, a professor at

5

the University of Connecticut, testified about how ballot order contributes to "proximity error." Herrnson testified that when voters make proximity errors—that is, accidentally select the candidate listed before or after the one they mean to select—the second-listed candidate is especially disadvantaged in races with more than two candidates. The reason for this disadvantage, Herrnson explained, is that voters who intend to select the first or last candidate in a list can err in only one direction, but voters who intend to select the second candidate can err in either direction.

The Secretary and the Republican intervenors presented the testimony of an expert witness, several election officials, and a corporate representative for one of Florida's election machine vendors. Michael Barber, a professor at Brigham Young University, critiqued Krosnick's methods and testified that Krosnick's estimate of an average five-percent primacy effect was not valid. Maria Matthews, Director of the Florida Division of Elections, and several county Supervisors of Elections testified about the state interests the challenged law serves. They explained that the statute helps prevent voter confusion, allows voters to more quickly find their preferred candidate or party for a particular office, promotes uniformity in administering elections across Florida's 67 counties and over 6,000 precincts, and helps limit errors in ballot layout. Matthews and the Supervisors also testified about the logistical difficulties of implementing the voters' and

6

organizations' requested relief, such as rotating the names of Democratic and Republican candidates between counties or between voting precincts within a county. And a corporate representative for an election machine vendor testified that he did not know whether the election machines could rotate Democratic and Republican candidates between the top two ballot positions and that it could take up to a year for the company to take the steps necessary for rotating candidate names.

After trial, the district court entered a final order. It rejected the Secretary's and intervenors' arguments that the voters and organizations lacked standing and that their complaint presented a nonjusticiable political question. And on the merits, it ruled that Florida's method of ordering candidates on the ballot is unconstitutional.

The district court ruled that both the voters and the organizations proved Article III standing. It reasoned that an "impact on the right to vote" is "common to all election laws," so the voters necessarily had an injury in fact. It also concluded that the organizations were injured because they spent resources to combat the primacy effect and because some unidentified voters who were members of the organizations would be harmed by the primacy effect. The district court did not squarely address whether any injury from ballot order is traceable to the Secretary, but it reasoned that the Secretary is responsible for ballot order because she is

7

Florida's "chief election officer." And although Florida law tasks the nonparty

Supervisors with placing candidates on the ballot in the correct order, Fla. Stat.

§ 99.121, the district court ruled that relief against the Secretary could redress the

voters' and organizations' injuries.

The district court also ruled that this lawsuit does not present a

nonjusticiable political question. It reasoned that the Supreme Court's summary

affirmance in *Mann v. Powell*, 398 U.S. 955 (1970) (mem.), established that the

voters and organizations' complaint was justiciable. And it rejected the argument

that complaints of unfair partisan advantage from ballot order are nonjusticiable

under *Rucho*, 139 S. Ct. 2484. The district court concluded that it could evaluate

the voters and organizations' complaint under the judicially manageable standards

established in *Anderson*, 460 U.S. 780, and *Burdick*, 504 U.S. 428. It decided that

*Rucho* was inapplicable because that decision was limited to complaints of partisan

gerrymandering.

On the merits, the district court ruled that the law is unconstitutional under

the approach established in *Anderson*, which requires courts to weigh the burdens

imposed by an election regulation against the state interests justifying the measure.

*See* 460 U.S. at 789. The district court found that "candidates of the major parties

in Florida receive an average primacy effect vote of approximately five percent

when listed first in their office block on the ballot." And based on "Florida's

8

history of election results in which the margin of victory or defeat is less than three to five percentage points," the district court found that the ballot statute "has impacted Plaintiffs' First and Fourteenth Amendment rights by systematically allocating that small but statistically significant advantage to Republican candidates" in recent years. It concluded the statute was "politically discriminatory" because it awarded the benefits of the primacy effect to a single political party in any given election. And it found that the State's asserted justifications for the statute—upholding the legislature's policy choice, preventing voter confusion, promoting uniformity, and promoting voter confidence in the election administration process—were "weak," "not particularly persuasive," and "not particularly strong on the specific facts of this case."

The district court awarded declaratory and injunctive relief. It declared that Florida's ballot-order scheme violated the First and Fourteenth Amendments. And it permanently enjoined the Secretary and the 67 Supervisors of Elections from implementing the ballot-order statute. Based on the Secretary's "responsibility for general supervision and administration of the election laws," the district court ordered the Secretary to neither "enforce, nor permit enforcement of," the statute. The district court also ordered the Secretary to "take all practicable measures within the scope of [her] official authority to ensure compliance with the terms of [its] Order." And it enjoined any "supervisor of elections of any Florida county"—

9

none of whom were named as defendants or served with process as parties to this lawsuit—from issuing "any ballot which is organized pursuant to" the statute. The district court also ordered the Secretary to "provide written guidance to the supervisors of elections of Florida's counties informing them that this Court has declared the [statute] unconstitutional" and to "include a true and correct copy of this Court's order in her written guidance."

The district court did not require Florida to adopt a specific alternative method of ordering candidates on ballots; it instead explained that two kinds of alternative schemes would be constitutional and allowed Florida to choose an alternative scheme. The first group of permissible schemes it identified were "rotational schemes," which "rotate candidates' names within their office blocks on a county-by-county or precinct-by-precinct basis." The district court explained that these schemes "equaliz[e] the burden on voting rights" by "distributing the candidate name order effects more evenly across all candidates." The second group of permissible schemes the district court identified are those that "cleans[e] the partisan taint from the process," such as ordering candidates alphabetically by last name, by the order in which they submit their qualifying paperwork, or by lottery.

## II. STANDARD OF REVIEW

We review questions of subject-matter jurisdiction *de novo*. *United States v. Pavlenko*, 921 F.3d 1286, 1289 (11th Cir. 2019).

10

## III. DISCUSSION

Federal courts have an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute. "For a court to pronounce upon . . . the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998). If at any point a federal court discovers a lack of jurisdiction, it must dismiss the action. *See MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351, 1357 (11th Cir. 2016).

Unfortunately, the district court took its obligation to ensure its jurisdiction far too lightly. It dismissed weighty challenges to the voters' and organizations' standing under Article III and to the justiciability of their complaint as a "hodgepodge" of "[p]reliminary [m]iscellanea." It then proceeded to declare Florida's ballot statute unconstitutional and enter an injunction against both the Secretary and the nonparty Supervisors. In doing so, the district court acted ultra vires by ordering relief that it had no jurisdiction to award.

This lawsuit suffers from two fatal jurisdictional defects. The voters and organizations lack standing, and their complaint presents a nonjusticiable political question. We discuss each defect in turn.

11

## A. *The Voters and Organizations Lack Standing.*

Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. "To have a case or controversy, a litigant must establish that he has standing," which requires proof of three elements. *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019). The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. If an action proceeds to trial, the facts necessary to establish standing "must be supported adequately by the evidence adduced at trial." *Id.* (internal quotation marks omitted). And when plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (internal quotation marks omitted).

We divide our discussion of why the voters and organizations lack Article III standing in two parts. First, we explain that neither the voters nor the organizations proved an injury in fact. Second, we explain that even if they had

12

proved an injury, that injury would be neither traceable to the Secretary nor redressable by relief against her.

1.  Neither the Voters nor the Organizations Proved an Injury in Fact.

We divide our discussion of injury in two parts. We first explain that the individual voters failed to prove an injury. We then explain that the organizations likewise failed to prove an injury.

a.  The Voters Failed to Prove an Injury.

Two of the three voters never testified at trial or in a deposition. The record contains no evidence about any injuries those two individuals suffered in the past or may suffer in the future. Indeed, we do not even know whether they plan to vote in future Florida elections.

When confronted with this lack of evidence, the district court reasoned that an "impact on the right to vote" is "common to all election laws," so the voters must have standing. But the Supreme Court has made clear that "a person's right to vote is individual and personal in nature," so "voters who allege facts showing disadvantage to themselves as individuals have standing to sue." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (internal quotation marks omitted). And of course, "[t]he facts necessary to establish standing . . . must not only be alleged at the pleading stage, but also proved at trial." *Id.* at 1931. Because they failed to offer

13

any evidence at trial showing disadvantage to themselves as individuals, these two voters failed to prove an injury.

The only voter who offered any evidence at trial was Nancy Jacobson. Jacobson testified that she "always vote[s]," that she "go[es] out of [her] way to vote in every election," and that she consistently votes for Democratic candidates. But Jacobson failed to identify any difficulty in voting for her preferred candidate or otherwise participating in the political process.

Although her brief is less than clear on this point, Jacobson appears to identify two threatened injuries from the ballot statute. The first is that some unidentified Democratic candidates for whom she will vote in future elections will lose those elections because of the primacy effect. The second injury is that—regardless of the outcome of any election—the ballot statute "dilutes" the votes of Democrats relative to Republicans by allocating the windfall vote entirely to Republican candidates. We reject both theories of injury.

To the extent Jacobson contends that she will be injured if a Democratic candidate for whom she votes loses an election or is at increased risk of losing, we disagree. A candidate's electoral loss does not, by itself, injure those who voted for the candidate. Voters have no judicially enforceable interest in the *outcome* of an election. *See Raines v. Byrd*, 521 U.S. 811, 819, 824, 830 (1997). Instead, they

14

have an interest in their ability to vote and in their vote being given the same weight as any other.

Raines, which involved the standing of legislators to challenge the constitutionality of the Line Item Veto Act, is instructive. *Id.* at 814, 816. Several legislators who voted against the Act sued to challenge it. *Id.* at 814. The Supreme Court explained that passage of the Act did not injure the legislators who voted against it because "their votes were given full effect," and the disappointed legislators "simply lost that vote." *Id.* at 824. The Court made clear that legislators have standing to challenge the defeat or enactment of legislation only if the outcome of the vote changed because their votes were "nullified"—that is, not counted at all. *Id.* at 823 & n.6. Jacobson does not argue that the ballot statute nullifies her vote. Instead, her complaint is that less careful voters will vote for Republican candidates solely because they appear first on the ballot, which might cause her preferred candidates to lose. Like the legislators in *Raines*, the first harm she identifies is an unfavorable electoral outcome, wholly apart from any allegation of vote dilution or nullification.

Although the voting rights of legislators and citizens are not identical, *see Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011), we conclude that absent any evidence of vote dilution or nullification, a citizen is not injured by the simple fact that a candidate for whom she votes loses or stands to lose an election.

15

And two of our sister circuits agree. *See Berg v. Obama*, 586 F.3d 234, 240 (3d Cir. 2009) ("Berg's wish that the Democratic primary voters had chosen a different presidential candidate . . . do[es] not state a legal harm."); *Becker v. Fed. Election Comm'n*, 230 F.3d 381, 390 (1st Cir. 2000) (holding that a candidate's decreased "chance of being elected" was "hardly a restriction on voters' rights and by itself [was] not a legally cognizable injury sufficient for standing"). Jacobson's first alleged injury is legally insufficient to establish Article III standing.

Insofar as Jacobson argues that the ballot statute will injure her by diluting her vote relative to the votes of Republicans, she failed to prove any such injury. Her theory of vote dilution appears to be that, because of Florida's ballot order and the primacy effect, it takes a greater number of careful Democratic voters than careful Republican voters to elect their preferred candidates. The reason for this disparity is that some less careful voters will select Republican candidates solely because they happen to appear first on the ballot, thereby diluting the votes of careful Democratic voters. Even assuming that this kind of "vote dilution" counts as an Article III injury, the evidence Jacobson offered is insufficient to prove it.

In *Gill*, the Supreme Court addressed whether voters had standing to challenge a partisan gerrymander based on the dilution of their votes. 138 S. Ct. at 1929–31. Partisan gerrymandering operates by placing voters of one party "in legislative districts deliberately designed to 'waste' their votes in elections where

16

their chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking)." *Id.* at 1930. The voters' theory of injury was that the partisan gerrymander caused their votes to "carry less weight" than they would "in another, hypothetical district" that had not been packed or cracked. *Id.* at 1931. But instead of offering evidence that they lived in a packed or cracked district, which could have shown "disadvantage to themselves as individuals," *id.* at 1930 (internal quotation marks omitted), the voters rested their case on a "theory of statewide injury to Wisconsin Democrats," *id.* at 1932.

To prove partisan vote dilution, the voters in *Gill* relied on an "average measure" of "partisan asymmetry" that compared the "statewide sum of one party's wasted votes" to "the statewide sum of the other party's wasted votes." *Id.* at 1933. The Supreme Court held that this average measure of the partisan effects of a gerrymander was insufficient to establish the voters' standing because it did not "address the effect that a gerrymander has on the votes of particular citizens." *Id.* It instead "measure[d] something else entirely: the effect that a gerrymander has on the fortunes of political parties." *Id.*

Jacobson similarly relies on a statewide average measure of the primacy effect in Florida elections to prove the injury of partisan vote dilution. Her experts testified, and the district court found, that candidates who appear first on the ballot in Florida receive an *average* primacy effect vote of about five percent. But the

17

experts acknowledged that this average measure tells us nothing about the existence or size of the primacy effect in any given election. Dr. Krosnick agreed that his analysis did not "mean that every Republican candidate receive[s] a [five] percent advantage by being listed first." As he explained, the primacy effect will be larger in some races and smaller in others. Indeed, because Jacobson relies solely on an average measure of the primacy effect, we cannot know how often the primacy effect is zero and how often it is much greater than five percent. Any estimates we might make about the variance in the primacy effect across races would be pure speculation.

As in *Gill*, the average measure of partisan advantage on which Jacobson relies is insufficient to prove that her individual vote will be diluted. "We need not doubt [Jacobson's] math" to reach this conclusion. *Id.* The reason her calculations cannot establish standing is that they "are an average measure." *Id.* "They do not address the effect" that ballot order and the primacy effect have "on the votes of *particular* citizens" in any given election. *Id.* (emphasis added). Instead, like the average measures at issue in *Gill*, Jacobson's calculations "measure something else entirely: the effect that [ballot order and the primacy effect have] on the fortunes of political parties" across many elections. *Id.* And complaints about that effect are based on nothing more than "generalized partisan preferences," which federal courts are "not responsible for vindicating." *Id.*

18

Much like the average measure of wasted votes in *Gill*, the average measure of the primacy effect treats all elections "as indistinguishable, even though their individual situations are quite different." *Id.* In low-information races between Democrats and Republicans, the primacy effect may be quite pronounced. But in an especially competitive, high-information race, the primacy effect may be negligible or nonexistent. Likewise, some races in noncompetitive districts may have no Republican candidates on the ballot at all and, hence, no primacy effect. An average measure of the primacy effect across all elections cannot tell us whether ballot order has diluted or will dilute Jacobson's or any other citizen's vote in any particular election. *See id.* (explaining that statewide average measures of partisan advantage were incapable of distinguishing between the effects of a gerrymander on one citizen as opposed to another).

Jacobson and the other voters failed to prove that they have suffered or will suffer partisan vote dilution in any particular election. As in *Gill*, this lawsuit presents a dispute "about group political interests, not individual legal rights." *Id.* The "generalized partisan preferences" on which the voters rely cannot provide an injury in fact sufficient for Article III standing. *Id.*

### b.  The Organizations Failed to Prove an Injury.

For their part, the organizations rely on two theories of injury. They seek to establish associational standing based on the injuries of their members, *see*

19

*Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009), and organizational standing based on their own injuries, *see Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350–51 (11th Cir. 2009). But they failed to prove an injury under either theory.

To establish associational standing, an organization must prove that its members "would otherwise have standing to sue in their own right." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The organizations contend that they have standing based on injuries suffered by Democratic voters and candidates who are their members. But five of the six organizations failed to even allege, much less prove, that they have *any* members—voters or candidates. That failure is fatal to their associational standing. *See Summers*, 555 U.S. at 498.

The only organization that describes itself as having members is the Democratic National Committee, but it failed to identify any of its members, much less one who will be injured by the ballot statute. *See id.* (requiring organizations to establish "that at least one identified member" will suffer an injury); *see also Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203–04 (11th Cir. 2018). And even if we accept as true the allegation of the complaint that the Committee's members include Democratic voters and candidates in Florida, the

20

Committee still has not proved that one of those unidentified members will suffer an injury.

Any voters and candidates in Florida face the same problem as Jacobson. That is, because the Committee relies solely on an average measure of the primacy effect, we have no basis to conclude that the primacy effect will impact any particular voter or candidate in any particular election. *Cf. Summers*, 555 U.S. at 497 (rejecting the argument that an organization could establish standing if there was "a statistical probability that some of [its] members are threatened with concrete injury"). And the Committee has not proved that at least one of its unidentified members "is certain to be injured by" the primacy effect. *Ga. Republican Party*, 888 F.3d at 1204.

The organizations argue that they have suffered an injury in their own right by diverting resources to combat the effects of the ballot statute. In *Havens Realty Corp. v. Coleman*, the Supreme Court held that an organization could establish standing to sue under the Fair Housing Act if it alleged, and later proved, that the challenged actions of the defendants drained its resources and thereby impaired its other operations. 455 U.S. 363, 378–79 & n.21 (1982). The housing organization in *Havens Realty* alleged that the defendants' discriminatory renting practices required it "to devote significant resources to identify and counteract" those practices, which "perceptibly impaired" the organization's "ability to provide

21

counseling and referral services for low- and moderate-income homeseekers." *Id.* at 379 (internal quotation marks omitted). The Court concluded that these allegations were sufficient to establish standing at the pleading stage, but it warned that at trial the organization would have to prove "that it has indeed suffered impairment in its role of facilitating open housing before it will be entitled to judicial relief." *Id.* at 379 & n.21. Because statutory standing under the Fair Housing Act "extend[s] to the full limits" of standing under Article III of the Constitution, *id.* at 372, we have applied the reasoning of *Havens Realty* to determine whether an organization has Article III standing based on the diversion of its resources. *See, e.g.*, *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1165 & n.14 (11th Cir. 2008).

Consistent with *Havens Realty*, our precedent holds that "an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Id.* at 1165. In *Browning*, we ruled that the NAACP and another organization had standing to challenge a voting requirement because the organizations would "divert personnel and time" from other activities "to educating volunteers and voters on compliance with" the requirement. *Id.* at 1166. In a later decision, we held that the NAACP had standing to challenge a law that required voters to present photo identification because the organization was

22

"actively involved in voting activities and would divert resources from its regular activities to educate and assist voters in complying with" the law. *Common Cause/Ga.*, 554 F.3d at 1350.

To establish resource diversion, the organizations cite the testimony of Daniel Kazin, the director of campaigns for the Democratic Congressional Campaign Committee. When asked why he believed the ballot statute harms the Committee, Kazin responded that "[b]ecause of the primacy effect, we need to spend additional resources in the target districts that we have." The organizations also rely on similar testimony from Guy Cecil, the chair of Priorities USA, who testified that the organization had to "invest more resources into [Florida] in order to compensate for" the primacy effect.

Although resource *diversion* is a concrete injury, neither Kazin nor Cecil explained what activities the Committee or Priorities USA would divert resources away *from* in order to spend additional resources on combatting the primacy effect, as precedent requires. *See Havens Realty*, 455 U.S. at 379 n.21; *see also Browning*, 522 F.3d at 1166 ("These resources would otherwise be spent on registration drives and election-day education and monitoring."); *Common Cause/Ga.*, 554 F.3d at 1350 (explaining that resources would be diverted "from 'getting voters to the polls' to helping them obtain acceptable photo identification" (alteration adopted)); *Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th

23

Cir. 2012) (observing that an immigration organization "cancelled citizenship classes to focus on" increased inquiries about a new law). Based on Kazin's testimony, we do not know what activities, if any, might be impaired by the Committee's decision to allocate "additional resources" to target districts because of the primacy effect. And Cecil's testimony likewise fails to identify any activities that will be impaired by Priorities USA's decision to "invest more resources" into Florida. Their testimony fails to establish an injury based on diversion of resources.

The organizations also contend that the ballot statute injures them by harming their mission of electing Democrats, but that harm is not a cognizable injury. An organization's general interest in its preferred candidates winning as many elections as possible is still a "generalized partisan preference[]" that federal courts are "not responsible for vindicating," no less than when individual voters assert an interest in their preferred candidates winning elections. *Gill*, 138 S. Ct. at 1933; *see also id.* at 1932 (rejecting a voter's "hope of achieving a Democratic majority in the legislature" as "a collective political interest" that cannot establish standing). Harm to an organization's generalized partisan preferences describes only "a setback to [its] abstract social interests," which is insufficient to establish a concrete injury in fact. *Havens Realty*, 455 U.S. at 379; *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (requiring "a concrete and

24

demonstrable injury, not an abstract social interest" for organizational standing (alteration adopted) (internal quotation marks omitted)).

We need not decide whether a political party would have standing to challenge an electoral practice that harmed one of *its* candidate's electoral prospects in a particular election. *See, e.g.*, *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (holding that the Texas Democratic Party had standing to challenge action that would reduce "its congressional candidate's chances of victory" in upcoming election). As discussed, the average measure of partisan advantage on which the organizations rely tells us nothing about whether ballot order has affected or will affect any particular candidate in any particular election. And in any event, the organizations do not argue that a particular candidate's prospects in a future election will be harmed. They instead contend that they have standing based on "systemic disadvantage" to the Democratic Party "relative to other political parties." Because that kind of harm from ballot order is based on nothing more than "generalized partisan preferences," it is insufficient to establish standing. *Gill*, 138 S. Ct. at 1933.

Our dissenting colleague argues that the Democratic National Committee, the Democratic Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee were injured because Florida's ballot order harms the electoral prospects of Democratic candidates. Dissenting Op. at 75–76.

25

We will assume the dissent is correct that a political *party* is injured by a practice that harms *its* candidates' electoral prospects. *See, e.g.*, *Tex. Democratic Party*, 459 F.3d at 586. Even so, it is not clear that the Democratic National Committee— much less the Democratic Senatorial Campaign Committee or the Democratic Congressional Campaign Committee—is identical to the Democratic Party of the United States for purposes of standing. And even if an injury to the Party is an injury to the Democratic National Committee, the Committee never proved that electoral harm to one of the Party's candidates is "certainly impending," so it lacks standing to seek prospective relief. *Clapper*, 568 U.S. at 401 (internal quotation marks omitted).

To begin, it is not obvious that the Democratic National Committee is identical to the Democratic Party of the United States for purposes of standing, such that any injury to the Party is necessarily an injury to the Committee. To be sure, the Committee "is responsible for the day-to-day operation" of the Party "at the national level." 52 U.S.C. § 30101(14). But the Supreme Court has held that the Party and the Committee are distinct entities that are not interchangeable for all purposes. *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 486 (1985) (holding that a federal statute empowered the Democratic National Committee to file a lawsuit but not the Democratic Party of the United States). The Party is not a plaintiff in this suit. *Cf. id.* at 482.

26

But even if we assume that an injury to the Democratic Party is an injury to the Democratic National Committee, the Committee never proved that one of *its* candidates is likely to lose a future election because of ballot order. The Democratic Party of the United States "[n]ominate[s] . . . Democratic candidates for the offices of President and Vice President of the United States." *The Charter of the Democratic Party of the United States* art. I, § 1 (as amended August 25, 2018), https://democrats.org/wp-content/uploads/2018/10/DNC-Charter-Bylaws-8.25.18-with-Amendments.pdf. But it does not nominate candidates for any other offices. Instead, the Florida Democratic Party, which is not a party to this suit, nominates candidates for other federal, state, and local offices. *The Charter of the Florida Democratic Party* art. I, §§ 7, 10 (as amended October 13, 2019), https://nmcdn.io/e186d21f8c7946a19faed23c3da2f0da/b1b96861a2534eba8191fd2315c6a596/files/FDP-BYLAWS---10-013-2019-Updated.pdf.

So even if we assume that the Democratic National Committee is indistinguishable from the Democratic Party of the United States, the Committee still would have to prove that the Democratic candidates for President and Vice President—*its* candidates—would likely lose a future election because of ballot order. And it has not done so. The average measure of the primacy effect on which the Committee relies cannot tell us what impact, if any, ballot order might have on a future presidential election. In fact, the evidence at trial suggested that the

27

primacy effect is *least* pronounced in high-information races at the top of the ballot, like presidential elections.

The only argument the dissent can muster for why the electoral harm to the candidates for President and Vice President is "certainly impending," *Clapper*, 568 U.S. at 401 (internal quotation marks omitted), is that the next general election is "two months away," Dissenting Op. at 89. That assertion does not prove that the Democratic candidates for President and Vice President will likely lose the next election because of ballot order. As for whether the Democratic National Committee has standing based on past injuries, the dissent argues that the ballot order and the primacy effect have put Florida Democratic candidates at an electoral disadvantage of about five percentage points over the past twenty years. *Id.* at 81–82. The dissent would hold that the Committee is injured because Florida's ballot order "has frustrated the [Committee's] goal of electing Democrats up and down the ballot across the country." *Id.* at 82 (internal quotation marks omitted).

This expansive theory of standing would allow *any* organization that favors the election of certain candidates to claim an injury based on harm to those candidates' electoral prospects. Although the dissent purports to limit its rule to "a political party and its committees," *id.* at 77, nothing in its reasoning supports that limit. Like the Committee, the other organizational plaintiffs in this lawsuit have the "goal" of electing Democrats and support Democratic candidates. *Id.* at 82.

28

And neither the Committee nor these other organizations nominated the vast majority of Democratic candidates that appear on Florida ballots. The only sense in which Democratic candidates other than those for President and Vice President are *the Committee's* candidates is that the Committee supports their candidacy and desires that they be elected. But the same is true of the other organizational plaintiffs, such as Priorities USA, and indeed countless organizations across America.

If a *voter* is not injured by his preferred candidate's loss of an election—and even the dissent does not dispute that proposition—it is hard to see how organizations other than the political party that nominated the candidate are injured. In either case, the asserted harm to a voter or an organization is based on "generalized partisan preferences," which are insufficient to establish standing. *Gill*, 138 S. Ct. at 1933 (rejecting a theory of standing based on "group political interests, not individual legal rights"). We conclude that no plaintiff proved an injury in fact.

2. Any Injury from Ballot Order Is Neither Traceable to the Secretary nor Redressable by Relief Against Her.

Even if the voters and organizations had proved an injury in fact, they would still lack standing because any injury would be neither traceable to the Secretary nor redressable by relief against her. Instead, any injury would be traceable only to 67 Supervisors of Elections and redressable only by relief against them. The voters

29

and organizations' failure to join the Supervisors as defendants is an independent reason that they lack standing to maintain this action.

To satisfy the causation requirement of standing, a plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations adopted) (internal quotation marks omitted). The voters and organizations contend that they are injured because Republicans, not Democrats, appear first on the ballot in Florida's general elections. So for them to have standing, the order in which candidates appear on the ballot must be traceable to the Secretary—the only defendant in this action. The problem for the voters and organizations is that Florida law tasks the Supervisors, independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute. Fla. Stat. § 99.121 ("The names of [candidates] shall be printed by the supervisor of elections upon the ballot in their proper place as provided by law."). The Secretary is responsible only for "certify[ing] to the supervisor of elections of each county . . . the names of persons nominated." *Id.* The voters and organizations have offered no contrary evidence to establish that the Secretary plays any role in determining the order in which candidates appear on ballots. "Because the [Secretary] didn't do (or fail to do) anything that contributed to [their] harm," the voters and organizations "cannot meet Article III's traceability

30

requirement." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc).

Our conclusion that any injury from ballot order is not traceable to the Secretary rests on the reality that the Supervisors are independent officials under Florida law who are not subject to the Secretary's control. The Supervisors are constitutional officers who are elected at the county level by the people of Florida; they are not appointed by the Secretary. Fla. Const. art. VIII, § 1(d); Fla. Stat. § 98.015(1). The Florida Department of State's organic statute does not list the Supervisors among its divisions, Fla. Stat. § 20.10(2), and the Board of County Commissioners, not the Department, compensates the Supervisors. *Id.* § 98.015(2). Only the Governor of Florida, not the Secretary, may suspend county officials such as the Supervisors, and only the state senate may remove them from office. Fla. Const. art. IV, § 7; *see also, e.g.*, Fla. Exec. Order No. 19-19 (executive order suspending the Supervisor of Elections for Palm Beach County); Fla. Exec. Order No. 18-342 (executive order suspending the Supervisor of Elections for Broward County). Indeed, the only means of control the Secretary has over the Supervisors is through coercive judicial process: she may bring "actions at law or in equity by mandamus or injunction to enforce the performance of any duties of a county supervisor of elections." Fla. Stat. § 97.012(14). That the Secretary must resort to judicial process if the Supervisors fail to perform their duties underscores her lack

31

of authority over them. Because the Supervisors are independent officials not subject to the Secretary's control, their actions to implement the ballot statute may not be imputed to the Secretary for purposes of establishing traceability.

Contrary to the reasoning of the district court, the Secretary's position as "the chief election officer of the state," *id.* § 97.012, with "general supervision and administration of the election laws," *id.* § 15.13, does not make the order in which candidates appear on the ballot traceable to her. We recently rejected a similar argument en banc. *See Lewis*, 944 F.3d at 1300. In *Lewis*, two workers sued the Attorney General of Alabama to challenge a state law that preempted a local ordinance requiring employers to pay higher wages. *Id.* at 1293–94. We explained that the workers' injury—receiving lower wages because of the state law—was not traceable to the Attorney General because he had never enforced or threatened to enforce the law, and the law itself contemplated no role for the Attorney General. *Id.* at 1296, 1298–99. And of particular relevance to this appeal, we rejected the workers' reliance upon "a host of provisions of the Alabama Code that generally describe the Attorney General's [enforcement] authority" to establish traceability. *Id.* at 1300. In the absence of any evidence that the Secretary controls ballot order, the voters and organizations likewise cannot rely on the Secretary's general election authority to establish traceability. *See id.* at 1298–1300. Florida law

expressly gives a different, independent official control over the order in which candidates appear on the ballot. *See* Fla. Stat. § 99.121.

Because the Secretary will not cause any injury the voters and organizations might suffer, relief against her will not redress that injury—either "directly or indirectly." *See Lewis*, 944 F.3d at 1301 (internal quotation marks omitted). An injunction ordering the Secretary not to follow the ballot statute's instructions for ordering candidates cannot provide redress, for neither she nor her agents control the order in which candidates appear on the ballot. Nor can declaratory relief against the Secretary directly redress any injury to the voters and organizations. A declaratory judgment against the Secretary does not bind the Supervisors, "who are not parties" to this action. *Id.* at 1302 (internal quotation marks omitted). As nonparties, the Supervisors are not "obliged . . . in any binding sense . . . to honor an incidental legal determination [this] suit produce[s]." *Id.* (internal quotation marks omitted). They remain lawfully entitled to print candidates' names on the ballot in the order prescribed by Florida law unless and until they are made parties to a judicial proceeding that determines otherwise. *See id.* at 1302–03.

To be sure, the district court ordered the Secretary to "provide written guidance to the supervisors of elections of Florida's counties informing them that this Court has declared the [statute] unconstitutional" and to include "a true and correct copy of this Court's order in her written guidance." But this "notice" theory

33

of redressability contravenes the "settled principle[]" that "it must be *the effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury." *Id.* at 1301 (internal quotation marks omitted). Any persuasive effect a judicial order might have upon the Supervisors, as absent nonparties who are not under the Secretary's control, cannot suffice to establish redressability. *See id.* at 1305 ("If courts may simply assume that everyone (including those who are not proper parties to an action) will honor the legal rationales that underlie their decrees, then redressability will *always* exist." (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment))). "Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Id.* (quoting *Franklin*, 505 U.S. at 825 (Scalia, J., concurring in part and concurring in the judgment)). Because the voters and organizations failed to sue the officials who will cause any future injuries, even the most persuasive of judicial opinions would have been powerless to redress those injuries.

Even if we consider the persuasive effect of the judgment on the nonparty Supervisors, the voters and organizations have not established that redress is likely "as a practical matter." *Utah v. Evans*, 536 U.S. 452, 461 (2002). They have not proved that declaratory relief against the Secretary will "significantly increase the

34

likelihood" that the Supervisors will ignore state law and follow a federal decree that does not bind them. *Lewis*, 944 F.3d at 1301. The Supervisors are obliged under state law to continue printing candidates' names "upon the ballot in their proper place as provided by law" regardless of what a federal court might say in an action that does not involve them. Fla. Stat. § 99.121. The district court's decision rests on the flawed notion that by declaring the ballot statute unconstitutional, it eliminated the legal effect of the statute in all contexts. But "federal courts have no authority to erase a duly enacted law from the statute books." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018); *see also Steffel v. Thompson*, 415 U.S. 452, 469 (1974) ("Of course, a favorable declaratory judgment . . . cannot make even an unconstitutional statute disappear." (internal quotation marks omitted)). Our power is more limited: we may "enjoin executive officials from taking steps to enforce a statute." Mitchell, *supra*, at 936. And we can exercise that power only when the officials who enforce the challenged statute are properly made parties to a suit.

The district court apparently understood that relief against the Secretary would not redress any injury to the voters and organizations, so it enjoined the Supervisors too. Its injunction stated, "No supervisor of elections of any Florida county . . . shall issue any ballot which is organized pursuant to the [ballot

35

statute]." And its opinion warned the Supervisors against "selectively interpret[ing] parts of" its order "or otherwise avoid[ing] compliance."

The district court exceeded its authority by purporting to enjoin the Supervisors, none of whom have ever been parties to this lawsuit. Although a district court may bind nonparties "who are in active concert" with a defendant, Fed. R. Civ. P. 65(d)(2)(C), that rule applies only when a plaintiff validly invokes federal jurisdiction by satisfying the traceability and redressability requirements of standing against a defendant. *See In re Infant Formula Antitrust Litig.*, 72 F.3d 842, 843 (11th Cir. 1995) ("The Federal Rules of Civil Procedure do not create federal jurisdiction."). If a plaintiff sues the wrong defendant, an order enjoining the correct official who has not been joined as a defendant cannot suddenly make the plaintiff's injury redressable. The district court was without jurisdiction to enjoin the lone defendant in this action, much less the nonparty Supervisors. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112 (1969) (holding that the district court erred when it enjoined a nonparty that was never determined to be in active concert with a defendant).

The district court also relied on an inapposite decision, *Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019), to conclude that relief against the Secretary would redress any injury to the voters and organizations. In *Lee*, a motions panel of this Court ruled that the Florida Secretary

36

of State was a proper defendant under *Ex parte Young*, 209 U.S. 123 (1908), in an action challenging an election procedure administered by the county Supervisors of Elections. 915 F.3d at 1316, 1318 (citing Fla. Stat. § 101.68). But Article III standing and the proper defendant under *Ex parte Young* are "[s]eparate[]" issues, *Lewis*, 944 F.3d at 1295, and *Lee* addressed only the latter. To be a proper defendant under *Ex parte Young*—and so avoid an Eleventh Amendment bar to suit—a state official need only have "some connection" with the enforcement of the challenged law. 209 U.S. at 157. In contrast, Article III standing requires that the plaintiff's injury be "fairly traceable" to the defendant's actions and redressable by relief against *that* defendant. *Lewis*, 944 F.3d at 1298, 1301 (internal quotation marks omitted). The district court erred by treating *Lee* as if it addressed—let alone resolved—the standing issues in this suit.

Because the voters and organizations lack standing to sue the Secretary, we have no occasion to consider whether the Secretary is a proper defendant under *Ex parte Young*—the only issue *Lee* addressed. *See id.* at 1296, 1306. Nor need we decide whether *Lee*—which was issued by a motions panel instead of a merits panel—is even binding precedent. *See Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020) (declining to vacate the opinion of the motions panel in *Lee* after the appeal became moot

because "the necessarily tentative and preliminary nature of [the] stay-panel opinion precludes the opinion from having an effect outside that case").

Our dissenting colleague says that the Secretary never advanced in this case the argument we adopt today, *id.* at 91–92, but that assertion tells only half the story. As the Secretary mentioned at oral argument, Oral Argument at 34:40–35:08 (Feb. 12, 2020), her office has repeatedly, if unsuccessfully, argued to the district judge who presided over this litigation that the Secretary has highly limited authority over county election officials, including the Supervisors. *See, e.g.*, *Rivera Madera v. Detzner*, 325 F. Supp. 3d 1269, 1275 (N.D. Fla. 2018) (Walker, C.J.) (rejecting the Secretary's argument that "he has no relevant power over the county supervisors of elections"); *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607-MW-CAS, 2016 WL 6090943, at *4–5 (N.D. Fla. Oct. 16, 2016) (Walker, J.) (rejecting the Secretary's arguments that "he cannot direct the [county] canvassing boards to comply with any order issued by this Court" and that "he does not possess the power to issue orders [to county officials] directing compliance with Florida's election laws"). The Secretary made clear at oral argument that her office has not changed its position on this issue, even if in this lawsuit she elected not to raise the argument yet again before a district court that had repeatedly rejected the Secretary's own understanding of her authority under state law. Oral Argument at 34:55–35:08 (Feb. 12, 2020) ("[W]e do not think we're the right defendant. We

38

have made this argument on several occasions . . . and, quite frankly, in the Northern District of Florida we have not succeeded . . . ."). So our ruling today is consistent with the Secretary's longstanding view about the scope of her powers.

The dissent next contends that the Secretary's authority to prescribe rules about ballot layout, Fla. Stat. § 101.151(9)(a), and to provide written direction to the Supervisors, *id.* § 97.012(16), makes the order in which candidates appear on the ballot traceable to her, Dissenting Op. at 95–100, but we do not see how. That the Secretary has the power to prescribe rules and issue directives about ballot order, which the Supervisors might well be obliged to follow, says nothing about whether she "possess[es] authority to *enforce* the complained-of provision," as the causation element of standing requires. *Lewis*, 944 F.3d at 1299 (emphasis added) (quoting *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)). If rulemaking authority were sufficient to establish traceability, plaintiffs could presumably also challenge a law by suing the legislators who enacted it instead of the officials who execute it. Although in many cases the same official will both make and execute a challenged regulation, that arrangement is not present here. *See* Fla. Stat. § 99.121.

The dissent also contends that an injunction forbidding the Secretary to provide the Supervisors with any instructions about ballot order would likely provide redress, Dissenting Op. at 101–102, 109–10, but we again do not see how.

Florida law already directs the Supervisors to place candidates on the ballot in the order "provided by law," Fla. Stat. § 99.121—that is, in the order prescribed by the ballot statute, *see id.* § 101.151(3)(a). An injunction ordering the Secretary to stay silent would do nothing to muzzle these two sections of the Florida code, which already bind the Supervisors to list candidates in a particular order. Indeed, one of the Supervisors testified at trial that they "apply the [ballot] statute" because it "is the law." There is no contrary evidence to suggest that the Supervisors would suddenly begin to disregard state law in the absence of instructions from the Secretary.

Under the dissent's theory of traceability and redressability, the only relief that might possibly redress any injuries from ballot order would be an injunction ordering the Secretary to promulgate a rule requiring the Supervisors to place candidates on the ballot in an order contrary to the ballot statute. But the voters and organizations never requested such extraordinary relief, and for good reason. Any such relief would have raised serious federalism concerns, and it is doubtful that a federal court would have authority to order it. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (explaining that the *Ex parte Young* exception to sovereign immunity "is limited to [the] precise situation" in which "a federal court commands a state official to do nothing more than refrain from violating federal law"); *cf. New York v. United States*, 505 U.S. 144, 177–78 (1992) (holding

that the federal government could not commandeer States to enact or enforce a federal regulatory scheme).

In any event, it is also far from clear that ordering the Secretary to promulgate a rule that is contrary to the ballot statute would even make redress likely. The voters and organizations have not argued that the Supervisors are likely to ignore a state statute that obliges them to place candidates on the ballot in a particular order in favor of a regulation issued by the Secretary. Again, their hesitation is not without good reason: Florida law is clear that when a regulation and a statute conflict, the statute prevails. *See Nicholas v. Wainwright*, 152 So. 2d 458, 460 (Fla. 1963). The dissent asserts that in this scenario the Supervisors would likely follow the Secretary's instructions over the statute. Dissenting Op. at 109–10. But "[w]e do not know what would justify" the dissent's confidence when Florida law is to the contrary. *Lujan*, 504 U.S. at 570 (plurality opinion).

It bears emphasis that even the district court understood the traceability and redressability problems inherent in this lawsuit. In an attempt to avoid those problems, it took the truly remarkable step of enjoining nonparties. Although the decision to enjoin nonparties was unjustifiable, it makes clear what the dissent says is murky: the Secretary plainly is not the cause of any alleged injuries from ballot order, and relief against her cannot redress those injuries.

41

To satisfy traceability and redressability, the voters and organizations should have sued the Supervisors of Elections instead of the Secretary of State. That approach would have made for more defendants, but nothing prevented the voters and organizations from taking that course of action. *See Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1243 (11th Cir. 1998) (explaining that the plaintiffs filed suit "against the Secretary of State and the sixty-seven county supervisors of elections"). Because they failed to sue the Supervisors, the voters and organizations lack Article III standing.

### B.  This Lawsuit Presents a Nonjusticiable Political Question.

In addition to the voters' and organizations' lack of standing, this lawsuit suffers from another fatal jurisdictional defect: it presents a nonjusticiable political question. We first place this dispute in context by providing a brief history of ballot regulation in America. We then explain that a complaint of unfair partisan advantage based on the order in which candidates appear on the ballot is a nonjusticiable political question.

### 1.  Ballot Regulation in America.

The history of ballot regulation in America reveals that concerns about balloting are as old as the Republic itself, and it makes clear that the political branches of state governments have long taken the lead in resolving those

controversies. The States also have taken a variety of approaches to addressing these perceived concerns.

At the Founding, Americans voted using their voices, a show of hands, or ballots prepared by individual voters, political parties, and party organizations. Joseph P. Harris, *Election Administration in the United States* 150–52 (1934); *Burson v. Freeman*, 504 U.S. 191, 200 (1992) (plurality opinion). The Southern States retained voice voting the longest; Kentucky did not abandon it until 1890. Harris, *supra*, at 151 & n.8. But because of the abuses associated with voice voting, including bribery and voter intimidation, most States began to use paper ballots within two decades of the Founding. *Burson*, 504 U.S. at 200 (plurality opinion).

As paper ballots became more widespread, some of the abuses associated with voice voting "reinfected the election process." *Id.* Political parties printed their ballots on colorful paper, often with distinctive designs, so that the ballots could be easily distinguished at the polls. Harris, *supra*, at 151. This practice threatened ballot secrecy and made bribery and voter intimidation easier to accomplish, so state legislatures enacted laws that required the use of white paper or official envelopes for ballots. *Id.* at 151–52.

Other abuses that had not been possible with voice voting also arose. The party organizations that printed the ballots engaged in fraudulent practices. They

43

would sometimes distribute fake ballots that bore the markings of one party but contained only a few of that party's candidates—"just enough to fool the unwary." *Id.* at 152. And in some elections, the party organizations would decline to place the names of some qualified candidates on their ballots, which made it impossible for those candidates to be elected. *Id.*

These abuses led Americans to adopt the "Australian ballot"—an official ballot containing the names of all qualified candidates that election officials distribute at the polls. *Id.* at 152–54. As its name suggests, this kind of ballot first appeared in Australia in the 1850s, and American States rapidly adopted it between 1887 and 1900. *Id.* Although a "true Australian ballot" grouped the names of all candidates beneath the office for which they were running without identifying their party affiliation, most American States did not adopt the original form of the Australian ballot. *Id.* at 154. Instead, the States modified the Australian ballot "to retain the strength of the political parties." *Id.* Many States grouped the candidates of each party into separate columns with a party circle at the top of each column that enabled voters to "vote a 'straight ticket' with a single mark." *Id.* at 155. Others retained the Australian ballot's grouping of candidates by office, adding only the party designation of the candidates. *Id.* at 154–55.

Concerns about the order in which candidates appear on the ballot have been with us since the adoption of the Australian ballot. By 1934, States followed

44

several different practices for ordering their ballots. States that used party-column ballots determined the parties' position on the ballot from left to right in one of five ways: (1) alphabetically, (2) a definite order fixed by state law, with the party in power given the first column, (3) in order of the votes received for some office in the last election, (4) by the election officer charged with preparing the ballot, or (5) by lottery. *Id.* at 180. Among political parties, the left-most column was "most desired," but the advantage gained from that position was viewed as "not great." *Id.*

In States that used office-group ballots, a common view was that "the position at the top of a list of candidates is of material help to the candidate thus favored." *Id.* at 181. States dealt with this perceived advantage for first-listed candidates in different ways. Some rotated the names of candidates by ballot or voting precinct, but others established a uniform ballot order based on the votes a party received in the last general election, candidate last name, the order in which nominating petitions were received, or lottery. *Id.* at 181–83.

Today, States continue to use different methods to order their ballots. Some States, like Florida, determine ballot order based on the results of the last election for Governor or another state office. Ariz. Rev. Stat. Ann. § 16-502(E); Conn. Gen. Stat. § 9-249a(a); Fla. Stat. § 101.151(3)(a); Ga. Code Ann. § 21-2-285(c); Ind. Code § 3-11-2-6(a)(1); Md. Code Ann., Elec. Law §§ 1-101(dd), 9-210(j)(2);

Mich. Comp. Laws § 168.703; Mo. Rev. Stat. § 115.239(1); Neb. Rev. Stat. § 32-815(1); N.Y. Elec. Law § 7-116(1); 25 Pa. Cons. Stat. § 2963(b); Tex. Elec. Code Ann. § 52.091(b). Others determine it based on the party that currently holds a majority in the state legislature, Tenn. Code Ann. §§ 2-1-104(a)(11)–(12), 2-5-208(d)(1), or the number of votes each party received in the last congressional election, Wyo. Stat. Ann. § 22-6-121(a). The Minnesota rule is similar to the NFL draft: candidates of the major party that won the *fewest* votes in the preceding election are listed first. Minn. Stat. § 204D.13(2). Delaware has the most straightforward rule: Democrats first, then Republicans. Del. Code Ann. tit. 15, § 4502(a)(5). And still other States order their ballots based on nonpartisan considerations. *See, e.g.*, Ala. Code § 17-6-25 (alphabetical by candidate last name); Ark. Code Ann. § 7-5-207(c)(1) (random lottery); Ky. Rev. Stat. Ann. § 118.225(1) (rotating candidate names in each congressional district).

2.  The Voters and Organizations' Complaint Is Nonjusticiable.

Against this wide array of state practice, voters and organizations brought this constitutional challenge to Florida's 70-year-old law that assigns the top ballot position to candidates of the incumbent Governor's party. They alleged violations of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment as interpreted in a line of decisions beginning with *Anderson*, 460 U.S. 780, and *Burdick*, 504 U.S. 428.

46

The voters and organizations' complaint, in a nutshell, is that Florida's ballot statute confers an impermissible partisan advantage on Republicans by virtue of the primacy effect. Because Republican candidates enjoy a "windfall vote" of approximately five percentage points from disinterested voters who reflexively pick the first candidate, the Democratic voters and organizations have a harder time electing their preferred candidates than if Florida distributed the windfall vote more evenly. They argue that this regime burdens their right to vote and should be evaluated using the approach established in *Anderson* and *Burdick*.

The recent decision of the Supreme Court in *Rucho* compels the conclusion that this complaint presents a nonjusticiable political question. This complaint shares the same critical feature that led the Supreme Court to hold complaints of partisan gerrymandering nonjusticiable in *Rucho*: neither this complaint of partisan advantage from ballot order nor complaints of partisan advantage from redistricting can be adjudicated using "judicially discernible and manageable" standards. *Rucho*, 139 S. Ct. at 2502.

In *Rucho*, the Supreme Court held that complaints of partisan gerrymandering are nonjusticiable for two main reasons. First, these complaints invariably rest on a threshold determination about what a "fair" apportionment of political power looks like. *See id.* at 2499–500. The Court reasoned that one possible standard of fairness—proportional representation—might have been

47

judicially manageable but had no basis in constitutional law or the history of the Republic. *See id.* at 2499. And absent proportional representation, the Court explained, "it is not even clear what fairness looks like in this context." *Id.* at 2500. Fairness could mean creating the greatest number of competitive districts, districting to ensure that each party receives its proportional share of "safe" seats, or adhering to traditional districting criteria. *Id.* (internal quotation marks omitted). And choosing between these different visions of fairness "poses basic questions that are political, not legal." *Id.*

Second, even if courts could agree on a standard of fairness, they would have to determine how much deviation from that standard in pursuit of partisan interests was permissible. *Id.* at 2501. Some amount of partisan gerrymandering is constitutional and inevitable. *Id.* at 2497. To hold that legislators could never consider partisan interests in districting "would essentially countermand the Framers' decision to entrust districting to political entities." *Id.* And in addition to the problem of deciding how much partisan *intent* is too much, complaints of partisan gerrymandering also present line-drawing problems concerning partisan *effect*—judges must decide "how much partisan *dominance* is too much." *Id.* at 2498 (emphasis added) (internal quotation marks omitted). For example, to police partisan gerrymandering, courts would "have to decide the ideal number of seats for each party and determine at what point deviation from that balance went too

48

far." *Id.* at 2501. Because the Constitution supplies neither an objective standard for the fair apportionment of political power nor any principled basis for identifying violations of that (nonexistent) standard, the Court concluded that complaints of partisan gerrymandering present nonjusticiable political questions. *Id.* at 2500–02.

Under the reasoning of *Rucho*, complaints of partisan advantage based on ballot order are likewise nonjusticiable political questions. The voters and organizations' complaint is based on the notion that Florida's ballot statute, by virtue of the primacy effect, confers an unfair partisan advantage on the party that last won the Governorship. But courts cannot rely on legal standards to adjudicate this kind of complaint because it does not allege *any* burden on individual voting rights. Instead, adjudicating this kind of complaint would require courts to pick among various conceptions of a politically "fair" ballot order that have no basis in the Constitution. For that reason, the complaint "poses basic questions that are political, not legal." *Id.* at 2500. And even if a judicially discernable and manageable standard for fairly ordering a ballot existed, there are no standards for determining how much of a departure from an ideal ballot order amounts to a constitutional violation. *See id.* at 2501. As we explain, *Rucho* cannot be persuasively distinguished from this appeal.

49

The basic problem with the voters and organizations' complaint is that it is not based on the right to vote *at all*, so we cannot evaluate their complaint using the legal standards that apply to laws that burden the right to vote. As the voters and organizations correctly point out, we must evaluate laws that burden voting rights using the approach of *Anderson* and *Burdick*, which requires us to weigh the burden imposed by the law against the state interests justifying the law. *Common Cause/Ga.*, 554 F.3d at 1352. But "we have to identify a burden before we can weigh it." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring in the judgment). And here it is impossible to identify a burden on voting rights imposed by the ballot statute that is susceptible to the balancing test of *Anderson* and *Burdick*.

The statute at issue here is unlike any law that this Court or the Supreme Court has ever evaluated under *Anderson* and *Burdick*. The statute does not make it more difficult for individuals to vote, *see, e.g.*, *Crawford*, 553 U.S. at 198 (plurality opinion) (photo-identification law); *Common Cause/Ga.*, 554 F.3d at 1354 (same), or to choose the candidate of their choice, *see Burdick*, 504 U.S. at 430 (prohibition on write-in voting). It does not limit any political party's or candidate's access to the ballot, which would interfere with voters' ability to vote for and support that party or candidate. *See, e.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 353–54, 358–59 (1997) (law forbidding individuals to appear

50

on the ballot as the candidate of more than one party); *Norman v. Reed*, 502 U.S. 279, 288–89 (1992) (ballot-access law for new parties); *Munro v. Socialist Workers Party*, 479 U.S. 189, 199 (1986) (ballot-access law for minor-party candidates); *Anderson*, 460 U.S. at 782, 786 (early filing deadline for candidate paperwork); *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1342–46 (11th Cir. 2020) (ballot-access law for minor-party candidates); *Fulani v. Krivanek*, 973 F.2d 1539, 1539, 1543 (11th Cir. 1992) (same). Nor does it burden the associational rights of political parties by interfering with their ability to freely associate with voters and candidates of their choosing. *See, e.g.*, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451–52 (2008); *Clingman v. Beaver*, 544 U.S. 581, 587, 593 (2005); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 213–14 (1986). And to state the obvious, the statute certainly does not create the risk that some votes will go uncounted or be improperly counted. *See, e.g.*, *Lee*, 915 F.3d at 1318–20 (challenge to signature-match procedures for absentee and provisional ballots); *Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006) (challenge to manual-recount procedures under which some ballots might "receive a different, and allegedly inferior, type of review in the event of a manual recount"). All the statute does is determine the order in which candidates appear in each office block on the ballot.

51

If the statute burdened voting or associational rights even slightly, we could apply legal standards to determine whether the burden was unconstitutional. Under *Anderson* and *Burdick*, we would weigh the burden imposed by the law against the state interests justifying that burden. *See Common Cause/Ga.*, 554 F.3d at 1352. But because the statute does not burden the right to vote, we cannot engage in that kind of review. The voters and organizations ask us to decide not whether the ballot statute burdens identifiable voting or associational rights, but whether it confers an unfair partisan advantage on the Republican Party. Indeed, this is the very theory of injury on which our dissenting colleague relies to establish the standing of the Democratic National Committee, the Democratic Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee under Article III. *See* Dissenting Op. at 74 ("Each committee experienced an injury in fact because the ballot-order statute has placed the Democratic Party at an enduring electoral disadvantage in Florida . . . .").

Instead of basing their complaint on individual voting or associational rights, the voters and organizations allege a novel complaint premised on the idea that the extra votes that flow from top ballot position should be distributed "fairly" between the major political parties. The "crux of [their] constitutional claim," they explain, "is the *way* in which" the ballot statute distributes the primacy vote "between similarly-situated major parties." In their view and the district court's,

52

fairness means distributing the primacy vote either evenly between the major parties or on some apolitical basis, like random lottery or alphabetically by candidate last name.

But sensible as those approaches might be, they are hardly the only ways to conceive of a "fair" ballot order. As in *Rucho*, "it is not even clear what fairness looks like in this context." 139 S. Ct. at 2500. Instead of splitting the primacy effect between the two major parties, perhaps Florida should ensure that each political party on the ballot—including minor parties—has an equal number of its candidates listed first for office. After all, parties that have qualified to be *on* the ballot are similarly situated with respect to any right to be *first* on the ballot. Or, because that approach might give an undue advantage to minor parties with few supporters, perhaps Florida should distribute the primacy effect proportionately based on the number of registered voters in each party. That is, if 20 percent of registered voters belong to one political party, that party's candidates should appear first on 20 percent of the ballots, and so on. Maybe Minnesota's approach is fairest: award the primacy effect entirely to one party—the party that received the *fewest* votes in the last election. Minn. Stat. § 204D.13(2). One could imagine many other ballot schemes that plausibly claim to be the fairest way, or at least *a* fair way, to distribute the primacy effect, including the one Florida adopted nearly

53

70 years ago: giving all parties the chance to win the primacy effect at each gubernatorial election.

As in the partisan gerrymandering context, picking among these alternatives "poses basic questions that are political, not legal." *Rucho*, 139 S. Ct. at 2500. "There are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral." *Id.* "Any judicial decision on what is 'fair' in this context would be an 'unmoored determination' of the sort characteristic of a political question beyond the competence of the federal courts." *Id.* (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)).

And even if courts could discern in the Constitution a standard of fairness for evaluating ballot-order regimes, they would run headlong into the second problem the Supreme Court identified in *Rucho*. There are no discernable and manageable standards "to answer the determinative question": How much partisan advantage from ballot order is too much? *See id.* at 2501; *see also id.* at 2498 (asking "how much partisan dominance is too much" (internal quotation marks omitted)). It is impossible to ensure that each candidate or party in a particular election appears at the top of the ballot an equal number of times. Election officials cannot know in advance how many ballots will be cast in a given race, let alone how many ballots will be cast in each county or voting precinct or which counties

54

and precincts have the largest numbers of disinterested voters. Relatedly, how large must the primacy effect be to create a constitutional problem? Two percent of voters? Five percent? Some greater share? If the standard is an "outcome determinative" number of voters, then any disparity in allocating the primacy effect could violate the Constitution in close races. Would awarding the primacy effect to a single political party be constitutional in a noncompetitive State where it would make no difference to electoral outcomes but unconstitutional in a battleground State? As with partisan gerrymandering, even if courts "knew which version of fairness to be looking for, there are no discernible and manageable standards for deciding whether there has been a violation." *Id.* at 2501.

At bottom, the voters and organizations' challenge to the ballot statute rests on the notion "that each party must be influential in proportion to its number of supporters." *Id.* Their complaint is that some voters who are neither Democrats nor Republicans will vote for the Republican candidate solely because the Republican is listed first, giving Republicans an advantage beyond their actual number of supporters. But the Supreme Court has never accepted that baseline as providing a justiciable standard in any context. It has instead emphatically rejected the idea that federal courts are "responsible for vindicating generalized partisan preferences." *Id.* (quoting *Gill*, 138 S. Ct. at 1933).

55

The federal judiciary's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Id.* (quoting *Gill*, 138 S. Ct. at 1933). Where an election law does not burden the right to vote in any way, we cannot vindicate individual rights. And we "have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct [our] decisions." *Id.* at 2507. The complaints of partisan gerrymandering in *Rucho* cannot be persuasively distinguished from the voters and organizations' complaint. A complaint that the order in which candidates appear on a ballot confers an impermissible partisan advantage to one party presents a nonjusticiable political question.

One possible response to the preceding analysis is that because the voters and organizations have not alleged any burden on voting rights, their complaint fails on the merits though it remains justiciable. But a complaint can both fail to state a constitutional violation *and* be nonjusticiable if there are no judicially discernible and manageable standards to adjudicate it. Take complaints of partisan gerrymandering. In the light of *Rucho*, we know that *any* complaint that a redistricting plan is unconstitutionally partisan must be dismissed as nonjusticiable—even if the challenged plan is so fair that it could not possibly violate the Constitution. Nor must a particular practice even be *capable* of

56

violating the Constitution for challenges to that practice to be nonjusticiable. Our guide, again, is *Rucho*. We do not know whether partisan gerrymandering can ever violate the Constitution; in its 46 years of attempting to adjudicate those complaints, the Supreme Court never declared a single redistricting plan unconstitutionally partisan. *Id.* at 2491, 2497–98, 2507. But even though partisan gerrymandering may not violate the Constitution, challenges to that practice are nonetheless nonjusticiable because they are unsuited for resolution by federal courts. *Id.* at 2507–08. The same is true for complaints of partisan advantage based on ballot order.

The voters and organizations' arguments that their complaint is justiciable are unconvincing. To make their case, they attempt to distinguish *Rucho*, invoke a host of inapposite precedents, and posit hypothetical laws that bear no resemblance to the challenged law in this action. None of their arguments have merit.

The voters and organizations first suggest that *Rucho* is distinguishable because the Supreme Court searched for a judicially manageable standard to police partisan gerrymandering "for decades" without success. But *Rucho* makes clear that complaints of partisan gerrymandering have *always* been nonjusticiable; it did not impose a requirement that courts first struggle to identify a justiciable standard for some period of time before declaring a complaint nonjusticiable. Complaints of partisan gerrymandering did not become nonjusticiable only after the Court tried

and failed to develop a standard. *See Lester v. United States*, 921 F.3d 1306, 1312 (11th Cir. 2019) (W. Pryor, J., respecting the denial of rehearing en banc) ("[W]e should be mindful of the difference between a change in judicial doctrine and a change in *law*." (emphasis added)). Instead, the Court's inability to discern a manageable standard was *evidence* that these complaints had always been "outside the courts' competence and therefore beyond the courts' jurisdiction." *Rucho*, 139 S. Ct. at 2494; *see also Lester*, 921 F.3d at 1313 ("Without distinguishing between judges' understanding of the law and the law itself, . . . the Supreme Court [could not] meaningfully describe a past decision of its own as 'wrong the day it was decided.'" (quoting *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 863 (1992) (joint opinion of O'Connor, Kennedy, and Souter, JJ.))). As discussed below, the judiciary's experience with partisan ballot-order complaints provides similar evidence that no judicially discernible and manageable standards exist to adjudicate them—that is, that these complaints have always been nonjusticiable.

The voters and organizations also argue that *Rucho* is distinguishable because some amount of partisan gerrymandering is constitutionally permissible in redistricting, but partisan considerations are off limits in the realm of election administration. And if partisan considerations are forbidden in election administration, that reality arguably eliminates the line-drawing problem the Supreme Court faced in *Rucho*—how much partisanship is too much? In the voters

58

and organizations' view, any partisanship is too much partisanship in this context. *Cf. Rucho*, 139 S. Ct. at 2502 (explaining that complaints of racial gerrymandering can rightly ask "for the elimination of a racial classification" but that complaints of partisan gerrymandering "cannot ask for the elimination of partisanship").

This argument has at least two problems. First, partisan considerations are not entirely off limits in election administration. Partisan motivations do not doom a nondiscriminatory election law if "valid neutral justifications" also support the law. *Crawford*, 553 U.S. at 204 (plurality opinion); *see also Common Cause/Ga.*, 554 F.3d at 1355. But even if partisan *motivations* were entirely off limits in election administration, that fact would not eliminate the line-drawing problems inherent in the voters and organizations' complaint, which is based solely on the partisan *effects* of the ballot statute. The voters and organizations have never argued that the Democrat-led legislature and Democratic governor that enacted the statute were motivated by impermissible partisan intent. Their complaint does not ask for the elimination of partisan intent in ballot order. It asks for a fair allocation of the primacy vote, much like the complaints of partisan gerrymandering in *Rucho* asked for "a [fair] level of political power and influence." 139 S. Ct. at 2499.

The voters and organizations next contend that because other challenges to election regulations are justiciable, theirs must be too. They point to *Williams v. Rhodes*, 393 U.S. 23, 24, 28 (1968), which held that a challenge to laws that "made

it virtually impossible" for certain political parties to access the ballot was justiciable. But *Williams* provides no support for their position.

Laws that limit the ability of candidates or parties to access the ballot burden "*voters'* freedom of choice and freedom of association." *Anderson*, 460 U.S. at 806 (emphasis added); *see also Socialist Workers Party*, 479 U.S. at 193 (explaining that ballot-access restrictions "impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively"). Standards exist to assess the burdens imposed by restrictions on ballot access. *See Socialist Workers Party*, 479 U.S. at 193–99. But no standards exist to judge challenges to the partisan advantage conferred by ballot order.

The voters and organizations contend that if we determine their complaint is nonjusticiable, other more nefarious ballot laws will be insulated from judicial review. They offer examples of hypothetical laws that require a "thumbs-up" or asterisk symbol next to candidates of the Governor's party, or that require the names of those candidates to appear in larger font, bold print, or a different color. Because challenges to these laws should be justiciable, they argue, so also should challenges to laws that govern ballot order.

Our holding that this lawsuit is nonjusticiable does not mean that challenges to these kinds of ballot laws are also nonjusticiable. The Elections Clause, which commits the regulation of the "Times, Places and Manner of holding Elections" to

60

state legislatures, U.S. Const. art. I, § 4, cl. 1, provides a judicially discernable and manageable standard to evaluate nonprocedural laws about ballot *content*. The Supreme Court has held that the Elections Clause establishes the boundaries of state authority over elections. *See Cook v. Gralike*, 531 U.S. 510, 523 (2001) ("[T]he States may regulate the incidents of such elections, including balloting, only within the exclusive delegation of power under the Elections Clause."). In *Cook*, the Court invalidated a Missouri law that placed a pejorative designation next to candidates who refused to support term limits because the law did not regulate the time, place, or manner of elections but instead sought to disparage or endorse particular candidates. *Id.* at 523–26. "Thumbs-up" laws could be evaluated under that standard, as could other laws that arguably do not regulate the manner of elections, like laws that provide favorable font choices for certain candidates. But *Cook* and the Elections Clause provide no standard to evaluate laws that govern ballot order. Unlike the law at issue in *Cook* or a "thumbs-up" law, laws that govern ballot order plainly regulate the manner of elections and are within the power of States to enact. To use an Australian ballot, Florida, like every other State, necessarily had to decide the order in which candidates' names appear on the ballot. And the choice of what order to adopt cannot be evaluated using legal standards because it "poses basic questions that are political, not legal." *Rucho*, 139 S. Ct. at 2500.

61

One might think that holding the voters and organizations' complaint to be nonjusticiable would mean that all challenges to ballot order are nonjusticiable, but that is not so. *Rucho* makes clear that one kind of challenge to a law can be justiciable and another nonjusticiable depending on whether judicially discernable and manageable standards exist to adjudicate the complaint. The Court explained that challenges to a redistricting plan based on racial gerrymandering or violations of the one-person, one-vote principle are justiciable because manageable standards exist to adjudicate those complaints, even though challenges to the same redistricting plan based on its partisan effects are nonjusticiable. *See id.* at 2501– 02. Similarly, if the voters and organizations' complaint were that Florida's ballot order somehow made it more difficult for Democrats to vote for their candidate of choice, their complaint would be justiciable, and we would have to weigh the burden imposed by the law against the State's regulatory interests. *See Burdick*, 504 U.S. at 434; *Common Cause/Ga.*, 554 F.3d at 1352. But that is not the kind of complaint the voters and organizations brought. They instead ask us to fairly apportion the primacy vote among the political parties, and that complaint falls squarely within *Rucho*'s definition of a political question.

The voters and organizations also argue that the decisions of other courts adjudicating complaints of partisan advantage based on ballot order prove that their complaint is justiciable. But the relevant decisions all predate *Rucho*. *See, e.g.*,

62

*Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016); *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 550–51 (6th Cir. 2014); *Koppell v. N.Y. State Bd. of Elections*, 153 F.3d 95, 96 (2d Cir. 1998); *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980); *Sangmeister v. Woodard*, 565 F.2d 460, 465 (7th Cir. 1977). And none of the decisions addressed whether complaints of partisan advantage based on ballot order are justiciable. More fundamentally, that courts have attempted to adjudicate a complaint does not mean the complaint is justiciable. Indeed, before *Rucho*, numerous lower courts had crafted *some* standard to adjudicate complaints of partisan gerrymandering. *See Rucho*, 139 S. Ct. at 2502–06.

Even taken on their own terms, these decisions support, rather than undermine, the conclusion that the voters and organizations' complaint is nonjusticiable. They provide evidence that the voters and organizations' complaint is inherently standardless, much as the many prior decisions attempting to adjudicate complaints of partisan gerrymandering did in *Rucho*. *See id.* at 2497–98. Because complaints of partisan advantage based on ballot order are not based on the right to vote at all, the courts in each of these decisions were forced to decide what constituted a fair method of allocating of the top ballot position and then determine whether the challenged law so departed from that standard of fairness that it violated the Constitution.

63

Unsurprisingly, the courts settled on different and sometimes contradictory standards. The Fourth Circuit, for example, concluded that "facially neutral and nondiscriminatory" ballot-order laws "impose[] only the most modest burdens" on voting and associational rights and for that reason survive scrutiny under *Anderson* and *Burdick*. *Libertarian Party of Va.*, 826 F.3d at 717. The Eighth Circuit, in contrast, held that "position advantage must be eliminated as much as is possible" and decided that the "fairest remedy" was "some form of ballot rotation whereby 'first position' votes are shared equitably by *all* candidates." *McLain*, 637 F.2d at 1169 (emphasis added). The Seventh Circuit did not require rotation of the top ballot spot among all candidates; instead, it held that laws governing ballot order pose no constitutional problem so long as they are "neutral" in character and do not intentionally favor one class of candidates over another. *Sangmeister*, 565 F.2d at 465–68. And at least one court has concluded that even a "neutral" method of assigning ballot position—alphabetically by candidate last name—violated the state constitutional rights of a candidate whose name would never allow him to appear at the top of the ballot. *Kautenburger v. Jackson*, 333 P.2d 293, 294–95 (Ariz. 1958). These decisions strengthen the conclusion that there are no judicially discernable and manageable standards for adjudicating complaints of partisan advantage based on ballot order. Such complaints present competing visions of fairness that are "unguided and ill suited to the development of judicial standards."

*Rucho*, 139 S. Ct. at 2501 (internal quotation marks omitted). Federal judges have no business deciding them.

The voters and organizations contend that the Supreme Court's summary affirmance in *Mann v. Powell*, 398 U.S. 955 (1970) (mem.), establishes that their complaint is justiciable, but that is plainly wrong. The law at issue in *Mann* placed candidates on the ballot in the order they submitted their nominating petitions and gave the Illinois Secretary of State unfettered discretion to break ties if he received multiple petitions simultaneously. 314 F. Supp. 677, 678–79 (N.D. Ill. 1969), *aff'd*, 398 U.S. 955. When the Secretary received two or more petitions simultaneously, he chose to break the tie in favor of incumbents. *Id.* A three-judge district court enjoined that practice *id.* at 679, and the Supreme Court summarily affirmed, *Mann*, 398 U.S. at 955. But the Court has cautioned that we must not overread its summary affirmances: "the precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions. A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment." *Anderson*, 460 U.S. at 784–85 n.5 (internal quotation marks omitted); *see also Mandel v. Bradley*, 432 U.S. 173, 176 (1977) ("Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below. When we summarily affirm, without

65

opinion, we affirm the judgment but not necessarily the reasoning by which it was reached." (alteration adopted) (internal quotation marks omitted)). *Mann* provides no basis to conclude that the Supreme Court has ever adjudicated a complaint based on the partisan effects of ballot order.

The dissent contends that our analysis of *Mann* must take into account the jurisdictional statement filed in that case. Dissenting Op. at 117–21. When a jurisdictional issue is "neither challenged nor discussed," the Supreme Court's exercise of its jurisdiction carries no precedential weight. *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996). But, the dissent argues, when a party raises an issue in a jurisdictional statement, the Court's summary affirmance rejects that specific challenge. Dissenting Op. at 117 (citing *Mandel*, 432 U.S. at 176). The dissent insists that although the jurisdictional issue in *Mann* was not discussed in the Supreme Court's summary affirmance, it was still challenged by the Illinois Secretary of State. *Id.* at 118–19 (citing Jurisdictional Statement, *Powell v. Mann*, 1970 WL 155703 at *6 (1970)). As a result, the dissent says, we must treat *Mann* as precedent.

But "the precedential effect of a summary affirmance extends no further than the precise issues presented," *Anderson*, 460 U.S. at 784–85 n.5 (internal quotation marks omitted), and this case presents a question different from the one in *Mann*. The law at issue in *Mann* gave the Illinois Secretary of State unfettered discretion

66

to break ties, whereas the law here gives no such discretion. Because of this key distinction, we cannot say that the Court's apparent conclusion in *Mann*—that a challenge to a discretionary ballot-ordering law that created no alleged partisan advantage is justiciable—has any bearing on a challenge to a non-discretionary ballot-ordering law that allegedly creates an unfair partisan advantage. In short, the dissent's reliance on *Mann* is misplaced.

Besides misreading the precedential value of *Mann*, the dissent also invents a threshold inquiry for evaluating potential political questions and contends that we have ignored this previously unrevealed test. Dissenting Op. at 122–23, 133. The Court held in *Baker v. Carr* that a challenge to a state reapportionment plan based on population inequality did not present a nonjusticiable political question because there was a "well developed and familiar" standard to evaluate such challenges— the Equal Protection Clause. 369 U.S. 186, 226 (1962). According to the dissent, *Baker*'s test is more lenient than the one used in *Rucho*, which requires there to be a judicial standard that rests on a "limited and precise rationale" and that is "clear, manageable, and politically neutral." Dissenting Op. at 126 (quoting *Rucho*, 139 S. Ct. at 2498). The dissent distinguishes *Baker* and *Rucho* by asserting that *Baker* is the general test for political questions, whereas the heightened *Rucho* test should be used "when judicial review of the particular claim at issue would create separation of powers concerns." *Id.* at 133.

67

The dissent's attempt to create a new framework for choosing between different tests for political questions is misguided. Although it is true that *Rucho* did not overrule *Baker*, nothing in *Rucho* suggests that the Supreme Court's test for the justiciability of challenges to partisan gerrymandering was an exception to a general test for other political questions. *See Rucho*, 139 S. Ct. at 2498–99. The reason the Court directed its analysis in *Rucho* toward partisan gerrymandering is that the claim in *Rucho* was about partisan gerrymandering. The dissent is trying to create a solution in search of a problem.

The voters and organizations' attempts to escape the reasoning of *Rucho* are all unavailing. Despite their many protests, *Rucho* compels the conclusion that complaints of unfair partisan advantage based on ballot order present nonjusticiable political questions. Although *Rucho* may seem counterintuitive to federal judges who are used to usurping the authority of state legislatures to regulate elections, it should not. The Constitution commits the "Times, Places and Manner" of holding congressional elections to legislatures—the state legislatures in the first instance, subject to any regulations Congress prescribes. U.S. Const. art. I, § 4, cl. 1. Our founding charter never contemplated that federal courts would dictate the manner of conducting elections—in this lawsuit, down to the order in which candidates appear on a ballot.

68

Alexander Hamilton explained in Federalist 59 that "a discretionary power over elections ought to exist somewhere," but that somewhere was not the federal judiciary. *The Federalist No. 59*, at 306 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001). Instead, Hamilton identified "only three ways in which this power could have been reasonably organized." *Id.* It could be "lodged wholly in the national legislature, or wholly in the state legislatures, or primarily, in the latter, and ultimately in the former." *Id.* The Constitution, of course, adopted the third option. But the district court in this action assumed for itself the "discretionary power over elections" that the Constitution assigns to the state and federal legislatures, in contravention of clear Supreme Court precedent that should have prevented it from reaching the merits of this dispute. Its decision to do so was error.

We offer one final word about the dissenting opinion. Although it purports to dissent from our judgment vacating the injunction for lack of jurisdiction, the dissenting opinion never says whether it would affirm the injunction or on what grounds. So although the dissent argues this dispute is justiciable, it offers no clues about how to resolve the appeal.

## IV. CONCLUSION

By entering a judgment on the merits when it had no justiciable case or controversy before it, the district court offered "no more than an expression of

69

opinion upon the validity of the [law] in question." *Muskrat v. United States*, 219 U.S. 346, 362 (1911). That kind of advisory opinion is beyond the power of federal courts. The district court should have dismissed the action because the voters and organizations lack standing and their complaint is nonjusticiable. It erred by reaching the merits and entering an injunction against nonparties whom it had no authority to enjoin. We **VACATE** the judgment against the Secretary and **REMAND** with instructions to dismiss for lack of jurisdiction.

JILL PRYOR, Circuit Judge, dissenting:

For the past 20 years, the Republican candidate's name has been listed first on every general election ballot in every race in every contested partisan election in the state of Florida. In this case, individuals and organizations sued Florida's Secretary of State to challenge as unconstitutional the state statute governing ballot ordering in general elections. Florida law requires the names of candidates from the governor's party to be listed first for each office on the general election ballot. *See* Fla. Stat. § 101.151(3)(a). The district court found after a bench trial that this ballot-ordering scheme has awarded Republican candidates a "small but statistically significant advantage" due to the tendency of some voters to select a candidate simply because his name is listed first (a phenomenon known as the "primacy effect" or "candidate name order effect"). Doc. 202 at 2.[1] As a result, the court concluded, the scheme violated the First and Fourteenth Amendments.

The merits question in this appeal is whether Florida's ballot-order law violates the Constitution by awarding the advantage created by the primacy effect to candidates based on their affiliation with the governor's political party, with a corresponding disadvantage to the opposing party. But before we can address the merits, we must be sure that we have jurisdiction to hear the appeal. *See MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351, 1357 (11th Cir. 2016).

---

[1] Citations in the form "Doc. #" refer to the district court's docket entries.

71

The majority opinion never reaches the merits of the plaintiffs' claims because it concludes that the case should have been dismissed for lack of jurisdiction. According to the majority, the district court should have dismissed the complaint because the plaintiffs failed to establish any of the three required elements of standing and their complaint raises a nonjusticiable political question based on the United States Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).

I disagree. I would conclude that at least three plaintiffs—the Democratic National Committee ("DNC"), the Democratic Senatorial Campaign Committee ("DSCC"), and the Democratic Congressional Campaign Committee ("DCCC") (together, the "Committees")—have standing. I would also conclude that their challenge to the ballot-order statute does not raise a political question. In holding that the district court lacked jurisdiction to hear any of the plaintiffs' claims, the majority opinion contorts beyond recognition Supreme Court precedent addressing the injury-in-fact, traceability, and redressability requirements for standing, as well as the scope of the political question doctrine. As a result, the majority opinion ends up imposing entirely new or substantially heavier burdens on plaintiffs who seek to challenge state election laws, burdens that the Supreme Court has never recognized.

## I.    The Committees Have Standing to Challenge the Ballot-Order Statute.

I begin with standing.  Plaintiffs the DNC, DSCC, and DCCC are the national committees of the Democratic Party and thus "responsible for the day-to-day operation of [the] party at the national level."  52 U.S.C. § 30101(14).  We have previously explained that the national committees are the "embodiment and manager[s] of the affairs" of the national party.  *Wymbs v. Republican State Exec. Comm. of Fla.*, 719 F.2d 1072, 1074 n.4 (11th Cir. 1983).  I would conclude that the Committees have standing to sue the Secretary of State to challenge the ballot-order law.

The Constitution limits the power of the judiciary to deciding "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  To satisfy the case-or-controversy requirement, a plaintiff must have standing to sue.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  To establish standing, a plaintiff must show (1) an injury in fact; (2) a causal connection between the injury and the causal conduct, meaning that the injury is fairly traceable to the defendant's conduct; and (3) a likelihood that the injury will be redressed by a favorable decision.  *Id.*; *MSP Recovery,* 835 F.3d at 1357.  Failure to demonstrate any one of these three elements defeats a plaintiff's standing.  The majority opinion concludes that the plaintiffs lack standing to sue the Secretary of State because at trial they failed to prove all three:  (1) that any plaintiff suffered an injury in fact; (2) that any injury a

73

plaintiff suffered, if one existed, was fairly traceable to the Secretary's conduct; and (3) that any injury a plaintiff suffered, if one existed, could be redressed by a judgment against the Secretary.

The Committees met all three elements. Each committee experienced an injury in fact because the ballot-order statute has placed the Democratic Party at an enduring electoral disadvantage in Florida by diminishing the electoral prospects of Democratic candidates throughout the state. As a result, the Democratic Party and the national committees that are the "embodiment[s]" of the party were injured by the ballot-order scheme. *Wymbs*, 719 F.2d at 1074 n.4. The Committees were injured because the ballot-order law made it—continues to make it—more difficult for them to raise funds, register voters, attract volunteers, generate support from independent voters, and recruit candidates to run for office. In addition, the Committees' injuries were traceable to the Secretary of State and redressable in litigation against her given her role under Florida law in implementing and overseeing how local election officials prepare ballots.

In holding that the Committees failed to establish each element of standing, the majority unveils a new understanding of these concepts, imposes a heavier burden on the plaintiffs than Supreme Court precedent and our precedent supports, and creates a split with authority from other circuits. Because the Committees

74

cleared the threshold hurdle of standing, we should reach the merits of their challenge to the ballot-order statute.

## A.    The Committees Suffered Injury in Fact.

First, the plaintiffs demonstrated that the Committees experienced an injury in fact. To establish an injury in fact, each committee had to prove that it suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted). For an injury to be concrete, it "must be *de facto*; that is, it must actually exist." *Id.* (internal quotation marks omitted). The Supreme Court has explained that the injury must be "real, and not abstract." *Id.* (internal quotation marks omitted).

The Committees experienced an injury in fact because Florida's ballot-order statute over time has disadvantaged Democratic candidates in Florida elections.[2] By damaging the electoral prospects of Democratic candidates, the statute has

---

[2] As organizational plaintiffs, each Committee alternatively could sue "on behalf of its members" if (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). To establish standing under this theory, an organization must show that at least one of its members has suffered or will suffer harm. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Because I conclude that each Committee itself experienced harm, I do not address standing based on harm to its members.

weakened the strength of the Democratic Party in Florida and necessarily harmed the Committees.

Let me briefly explain how the statute harmed the electoral prospects of Democratic candidates in Florida. By design, the ballot-order statute awarded (and continues to award) an advantage to one major political party over the other, ensuring that when a party secures the governor's office in Florida, candidates from the governor's political party receive a windfall by virtue of being placed first on the ballot. *See* Fla. Stat. § 101.151(3)(a). The district court's factual findings established that this advantage has been and continues to be significant. As the district court found, "[C]andidates of the major parties in Florida receive an average primacy effect vote of approximately five percent when listed first in their office block on the ballot," and "this advantage accrues to a candidate because of the candidates' name order." Doc. 202 at 45.

The majority argues that this evidence was insufficient to show that any particular candidate has been harmed because it "tells us nothing about whether ballot order has affected or will affect any particular candidate in any particular election." Maj. Op. at 25. Although it is true that the district court did not identify *the* candidate(s) in particular race(s) who would have won but for the ballot-order statute's allocation of the primacy effect windfall to the governor's party, the district court found that *some* Democratic candidates lost elections because of that

76

allocation. As the district court explained, "a vast number of Florida's elections have been decided by less than three to five percent of the votes cast—in other words, by a smaller margin than the advantage Florida's ballot-order scheme awards to the candidates affiliated with the party of Florida's last-elected governor." Doc. 202 at 46. Based on this evidence, the court concluded that the ballot-order statute did "indeed make a difference to the outcome of elections in Florida."[3] *Id.* at 48.

By placing Democratic candidates at a systemic disadvantage, the ballot-order statute harmed the Democratic Party as well as its national committees. I begin with the premise that a political party and its committees enjoy First Amendment rights of association. "The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). Just as individuals enjoy a right to associate, political parties do, too. *See id.* at 358; *see Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) (concluding that state election law imposed a burden "upon the

---

[3] On appeal, the appellants have not challenged the district court's findings of fact as clearly erroneous. *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 74 n.19 (1978); *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1271 n.9 (11th Cir. 2001). (explaining that although we review a district court's determination that a plaintiff has standing *de novo*, we "generally review[] a district court's underlying factual findings only for clear error").

associational rights of the Party"). This First Amendment right also extends to "political committees" like the Committees in this case. *Colo. Republican Fed. Campaign Comm. v. Fed. Elec. Comm'n*, 518 U.S. 604, 616 (1996).

When a law harms the electoral prospects of a political party's candidates, the party experiences an associational injury. The majority does not seriously challenge this principle. And with good reason—an electoral victory enables the winning party "to better direct the machinery of government toward the party's interests." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006). By awarding an advantage to the candidates from the governor's political party, the ballot-order statute necessarily disadvantages the other major political party in elections and thus weakens its strength and ability to carry out its mission and objectives. When deprived of political strength, the party and its committees experience an "associational harm" because they "may face difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)." *Gill v. Whitford*, 138 S. Ct. 1916, 1938 (2018) (Kagan, J., concurring).

The majority claims that the Committees failed to establish injury in fact because any harm they experienced was "based on nothing more than generalized partisan preferences" and thus was insufficient to establish standing under the

78

Supreme Court's decision in *Gill*. *See* Maj. Op. at 25 (internal quotation marks omitted). But nothing in *Gill* forecloses political parties from establishing associational harm based on systemic electoral disadvantage. In *Gill*, the Supreme Court rejected the claims of *individual voters* who challenged a Wisconsin redistricting plan as an unconstitutional partisan gerrymander on the ground that the plan unfairly favored Republican voters and their candidates. 138 S. Ct. at 1923–24. The voters argued that they were injured because the gerrymander diluted their votes. *See id.* at 1930–31. The Supreme Court accepted that a voter was harmed if the composition of the voter's own district caused her vote to carry less weight than it would carry in another, hypothetical district. *Id.* at 1931. But because the plaintiffs had introduced no evidence addressing whether such dilution had occurred in their districts, the Court remanded the case to give the plaintiffs an opportunity to come forward with such evidence. *Id.* at 1932, 1934.

The Court also considered whether the voters had standing to challenge the gerrymander throughout the state on the theory that it harmed their interests in "collective representation in the legislature" and "in influencing the legislature's overall composition." *Id.* at 1931 (internal quotation marks omitted). The Court rejected the voters' argument, concluding that a "citizen's abstract interest in policies adopted by the legislature . . . is a nonjusticiable general interest common to all members of the public." *Id.* (internal quotation marks omitted).

In a separate concurring opinion, Justice Kagan, joined by three other justices, wrote that partisan gerrymandering could inflict a constitutional injury by infringing the rights of association held by political parties and their related organizations.  *Id.* at 1934 (Kagan, J., concurring).  On this theory, one the voters never directly argued, Justice Kagan would have found that individual voters suffered an injury in fact based on the associational harm that resulted when the gerrymander deprived their party of its "natural political strength."  *Id.* at 1938.  And, she emphasized, "what is true for the party members" with respect to this associational harm "may be ***doubly true for party officials and triply true for the party itself (or for related organizations*)."  *Id.* (emphasis added).  As she explained, when a state law places a party "at an enduring electoral disadvantage," the party is injured because the law "weakens its capacity to perform all its functions."  *Id.*

Justice Kagan advanced her theory of injury to a political party in a separate concurrence, but the majority opinion did not reject the theory.  Instead, the majority declined to address it, expressly leaving it "for another day," because the question was not presented; there was no political party plaintiff.  *See id.* at 1931 (majority opinion) (stating that the majority was not deciding whether there would be an injury in fact in a case "involving different kinds of plaintiffs and differently alleged burdens" (citation omitted)).

80

Ignoring that the *Gill* majority expressly did not—and could not, given the absence of a political party plaintiff—decide whether a political party experiences injury when the challenged conduct places it at a systemic disadvantage relative to another party, the majority opinion here nevertheless relies on *Gill* to support its conclusion that the Committees cannot establish injury under a theory of associational harm. Because *Gill* expressly reserved consideration of that argument, it offers the majority no support.

The majority opinion raises another reason why the Committees have suffered no harm: it claims that because the Committees are not "identical" to the Democratic Party, an injury to the Democratic Party is not "necessarily an injury to the Committee[s]." Maj. Op. at 26. But we need not decide whether in *all* circumstances harm to the Democratic Party also injures the Committees. We have a narrower question before us: when a state's election law harmed the Democratic Party by systematically disadvantaging Democratic candidates in elections, were the Committees also injured? The answer is yes. The diminished electoral prospects of Democratic candidates made it harder for the Committees to achieve the Party's goals and carry out its day-to-day operations. As I explained above, the Committees are the "embodiment and manager[s] of the affairs" of the national Democratic Party, *Wymbs*, 719 F.2d at 1074 n.4, and "responsible for the day-to-day operation of [the] party at the national level." 52 U.S.C. § 30101(14). The

81

fact that Democratic candidates running for office in Florida over the past 20 years have faced an approximately five percentage point disadvantage has frustrated the DNC's goal of electing Democrats "up and down the ballot across the country." Doc. 195-4 at 15. It likewise has frustrated the DSCC's goal of electing Democrats to the United States Senate and the DCCC's goal of electing Democrats to the House of Representatives.[4] *See Pavek v. Donald J. Trump for President, Inc.*, No. 20-2410, __ F.3d __, 2020 WL 4381845, at \*1 & n.2 (8th Cir. July 31, 2020) (holding that DSCC and DCCC were injured because Minnesota ballot-order law caused Republican candidates to be listed first on ballots).

The only authority the majority opinion marshals to support its position that an injury to the Democratic Party is not an injury to the Committees is the Supreme Court's decision in *Federal Election Commission v. National Conservative Political Action Committee* ("*NCPAC*"), 470 U.S. 480 (1985). But *NCPAC* merely recognized that the Democratic Party was not interchangeable as a plaintiff with its national committee when a federal campaign finance statute expressly authorized the committee—but not the party—to sue.

---

[4] Because the DSCC and DCCC focus on electing Democratic candidates to the United States Senate and House of Representatives, respectively, I accept that each has a direct interest in a limited number of elections in Florida. Even so, both have suffered injury as a result of the ballot-order statute, as we can see from the close margins in recent elections where they supported candidates. For example, in Florida's most recent Senate election, the Republican candidate defeated the Democratic candidate 50.1 percent to 49.9 percent. And in a recent congressional race in Florida, the Republican candidate defeated the Democratic candidate by less than five percent.

In *NCPAC*, two political action committees ("PACs") announced they would be spending large amounts of money to support President Ronald Reagan's reelection campaign.  But President Reagan had accepted public funding, and a federal campaign finance law barred the PACs from spending more than $1,000 to further the election of a presidential candidate who received public financing.  *Id.* at 482–83 (citing 26 U.S.C. § 9012(f)).  The Democratic Party sued the two PACs under a federal statute that permitted the Federal Election Commission ("FEC"), a "national committee of any political party," or any individual eligible to vote for President to bring an action to "implement or construe any provision of" the campaign finance law.  26 U.S.C. § 9011(b)(1).

The Supreme Court concluded that the Democratic Party lacked a right of action to sue under the statute.  *NCPAC*, 470 U.S. at 485–86.  The party had no right of action under the statute, the Court explained, because Congress had expressly authorized only a "national committee of any political party" to sue to enforce the statute; the party itself was "[c]learly" not included in the list of entities and individuals who could sue.  *Id.*  Certainly, *NCPAC* tells us that a political party is not interchangeable with its national committee when Congress expressly gave the committee but not the party a right of action to enforce the law.  But *NCPAC* did not address the entirely separate and different question of whether a political party's national committee experiences an injury when a challenged practice harms

83

the electoral prospects of the party's candidates. *NCPAC* lends no support to the majority's position that only the party, not its committees, were injured here.

The majority contends that I make other errors in concluding that the Committees were injured. First, the majority opinion argues that my analysis establishes only that the *Florida* Democratic Party has been injured and says nothing about whether the Democratic Party of the United States or its committees were injured. Second, the majority opinion argues that my analysis is incomplete because to have standing in this case the Committees had to show that they faced an imminent injury. In raising both arguments, the majority oversimplifies the facts and misapplies the law, resulting in a flawed analysis.

First, the majority opinion asserts that the Committees were not injured because for each Committee there was no evidence that "one of *its* candidates is likely to lose a future election because of ballot order." Maj. Op. at 27. According to the majority opinion, the national Democratic Party and its committees could be injured only when Democratic candidates for the offices of President and Vice President of the United States suffer electoral disadvantage because these are the only two offices for which the Party itself nominates candidates. For every other race in Florida, the majority argues, the candidates are nominated by the Florida Democratic Party and therefore the national party and committees can suffer no injury from ballot order in those races.

Even though the state party formally nominates the candidates for races other than President and Vice President, I am not persuaded that we can so neatly unwind the roles of the Democratic Party of the United States and the Florida Democratic Party when it comes to elections. The charters of the national Democratic Party and the state Democratic Party reflect that each organization "assist[s]" the other in the election of Democratic candidates in Florida. *See Charter of the Democratic Party of the United States* art. I, § 3, available at https://democrats.org/wp-content/uploads/2018/10/DNC-Charter-Bylaws-8.25.18-with-Amendments.pdf**;** *Charter of the Florida Democratic Party* art. I, § 9, available at https://nmcdn.io/e186d21f8c7946a19faed23c3da2f0da/b1b9 6861a2534eba8191fd2 315c6a596/files/FDP-BYLAWS---10-013-2019-Updated.pdf. DNC members from Florida are members *ex officio* of the Florida Democratic Party's State Executive Committee, which is responsible for managing the party's affairs within the state, and of the Florida Democratic Party's Central Committee, which operates and manages the State Executive Committee. The State Executive Committee, in turn, elects Florida's representatives to the DNC. In addition, the DNC exercises at least some oversight over the Florida Democratic Party because the state party must conduct its affairs according to the DNC's charter and any resolutions the DNC passes.

The majority opinion's attempt to draw a rigid divide between the roles of the Democratic Party of the United States and the Florida Democratic Party in nominating candidates also ignores that the state of Florida presents the candidates to voters as belonging to a single party. Ballots in Florida do not identify the candidates for President and Vice President of the United States as belonging to the national Democratic Party and all other Democratic candidates as belonging to the Florida Democratic Party. Instead, ballots identify all Democratic candidates, whether running for President or any other office, by the three-letter identifier "DEM."[5] *See* Fla. Stat. § 101.151(3)(A) (requiring that a candidate's party be listed on the ballot "with an appropriate abbreviation of the party name"); Fla. Admin. Code Ann. r. 1S-2.032(9)(c) (2020) (directing that the party identifier on a ballot must be the abbreviation assigned by the Secretary of State's office).

The majority's rigid distinction between the national and state parties also ignores the Committees' theory of associational harm. Under that theory, *all* Democratic candidates in Florida (whether nominated by the national or the state Democratic Party) for the past 20 years have faced an enduring electoral disadvantage. So the ballot-order statute has negatively impacted efforts in Florida by *both* the state party and the national party to raise funds, register voters, attract

---

[5] Similarly, Florida ballots identify all Republican candidates, whether running for President or any other office, by the three-letter identifier "REP."

86

volunteers, generate support from independents, recruit candidates to run for office, and ultimately achieve Democratic policy objectives. Even if the majority is correct that the only candidates directly associated with the national Democratic Party are the candidates for President and Vice President, the national party, represented by the DNC, nevertheless suffered an injury in fact as a result of the ballot-order scheme.

The majority opinion argues that, applying my logic, "any organization that favors the election of certain candidates" would be able "to claim an injury based on harm to those candidates' electoral prospects." Maj. Op. at 28. Again, the majority ignores the specific context before us. Florida ballots show only a candidate's political party affiliation; they do not name any other organization that happens to support the candidate. *See* Fla. Stat. § 101.151(3)(a). The ballot-order statute sets the order of candidates by, and thus awards an electoral advantage based solely on, party affiliation. I do not see how recognizing that the ballot-order statute has injured the Committees, the day-to-day operational bodies of the Democratic Party, would create a slippery slope and dictate the outcome of a future case involving some other organization that is neither a political party nor a party's national committee.

The majority opinion's second argument is that the Committees have shown no injury in fact because they failed to prove that their injuries were "certainly

87

impending." Maj. Op. at 26 (internal quotation marks omitted). The majority opinion cites the Supreme Court's decision in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), as establishing the requirement that a plaintiff must face a certainly impending injury to have suffered an injury in fact. But *Clapper* presented unique circumstances that do not inform our inquiry here.

On the day that amendments to the Foreign Intelligence Service Act ("FISA") went into effect, authorizing the government to conduct certain foreign surveillance, several individuals and organizations filed a lawsuit challenging the amendments. *Id.* at 406–07. The Court concluded the plaintiffs lacked standing to challenge the new law because they failed to establish injury. The Court explained that to establish standing a plaintiff's injury had to be "actual *or* imminent." *Id.* at 409 (emphasis added) (internal quotation marks omitted). Because the plaintiffs were challenging new provisions of FISA that had just gone into effect, no plaintiff claimed or could have claimed that the government had previously surveilled his communications under the amendments. *See id.* at 411. Instead, each plaintiff claimed that he had standing to challenge the new law because it was "imminent[]" that the government would target his foreign contacts for surveillance and thus intercept his communications. *Id.* at 411.

The Court rejected the plaintiffs' argument. Because the plaintiffs had "no actual knowledge" of the communications the government would target, they were

88

"speculat[ing]" that the government would acquire their communications and had not shown that any injury was "certainly impending." *Id.* at 410–11. *Clapper* addressed a singular situation in which the plaintiffs could not yet have suffered any harm because the statute they were challenging went into effect on the very day they sued.

According to the majority, under *Clapper*, the Committees have standing only if their injuries were certainly impending. Not only were the circumstances in *Clapper* entirely different, but the Court noted in that case that a plaintiff can establish standing based on ***either*** an actual ***or*** an imminent injury. *See id.* at 409. *Clapper* does not require the Committees—which, the district court found, suffered a past disadvantage due to the ballot-order statute—to prove that they also face a certainly impending injury. *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 211 (4th Cir. 2017) (explaining that when a plaintiff establishes an "an actual and ongoing injury . . . *Clapper*'s certainly-impending analysis [is] inapposite"). Because the Committees suffered actual injuries, they have standing regardless of whether they face certainly impending harm.

Even if the Committees were required to satisfy the certainly impending standard, however, at least two of the committees—the DNC and DCCC—satisfied the standard. We are two months away from a general election in which all Democratic candidates appearing on the ballot in Florida will be placed at a

89

systemic disadvantage by the ballot-order law.  Given its interest in supporting candidates up and down the ballot, including for the offices of President and Vice President, the DNC faces an injury that is certainly impending and not speculative. And because the DCCC supports candidates throughout Florida running as Democrats for Congressional seats, including in two districts where the Republican incumbent is not running for reelection, it faces certainly impending injury as well. Both of these committees satisfied *Clapper*'s standard.

To recap, the district court's findings of fact established that the ballot-order law placed Democratic candidates in Florida at a significant electoral disadvantage in the past and continuing into the future.  Because this systemic disadvantage has weakened the Committees' ability to perform their functions in Florida, I would conclude that each Committee suffered an associational injury.

**B.      The Committees' Injuries are Traceable to the Secretary of State and Redressable in Litigation Against Her.**

After concluding that the plaintiffs suffered no injury in fact, the majority opinion goes on to offer alternative holdings on traceability and redressability.  To establish that their injuries were traceable to the Secretary of State's conduct, the Committees had to prove a "causal connection" between their injuries and the conduct they complained of.  *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).  To establish that their injuries were redressable by suing the Secretary, the Committees had to prove that it was "likely,

90

as opposed to merely speculative" that their injuries would "be redressed by a favorable decision" against the Secretary. *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1253 (11th Cir. 1998) (internal quotation marks omitted). As the majority opinion reflects, the issues of traceability and redressability turn on our interpretation of Florida law. In deciding whether the Committees satisfied the traceability and redressability requirements, then, we must consider the extent of the Secretary of State's authority under Florida state law when it comes to ballot order.

According to the majority opinion, the plaintiffs failed to establish redressability or traceability because Florida law tasks county election supervisors, "independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute." Maj. Op. at 30. The majority opinion interprets Florida law as (1) placing all responsibility for the ordering of candidates on the ballots with the county election supervisors, thus giving the Secretary no "role in determining the order in which candidates appear on ballots," and (2) giving the Secretary no control over the county election supervisors. *Id.* I note that no Florida court has ever held that the Secretary of State's authority is so limited. Perhaps even more remarkable, the majority's argument about the Secretary of State's authority is one that she herself never raised in this case, even though, as the majority opinion demonstrates, it would have been to her

91

advantage.[6]  And yet the majority opinion concludes that this case presents a straightforward question about the proper interpretation of Florida's Election Code.

The questions of traceability and redressability present embedded questions of Florida law about how the state of Florida has structured its government to divide power between state and local officials in the crucial function of holding elections.  The plain language of Florida's Election Code reveals that the Secretary of State played a sufficient role in setting ballot order and exercised adequate control over the county election supervisors to support standing.  In this section, I review the provisions in Florida's Election Code defining the scope of the Secretary of State's authority, with emphasis on three provisions that the majority opinion seems to misapprehend.  Because the majority opinion's understanding of Florida law is wrong, so are its holdings on traceability and redressability.

> **1.    Under Florida Law, the Secretary of State Plays a Role in Setting Ballot Order and Controls How County Election Supervisors Organize Ballots.**

To understand the scope of the Secretary of State's authority, we must interpret Florida's Election Code, following Florida's rules of statutory

---

[6] The majority opinion downplays the significance of the Secretary of State's decision not to argue traceability or redressability in this case by suggesting that it was simply a strategic call not to raise these arguments before a district court judge who had repeatedly rejected them in other cases.  But this supposition fails to account for the Secretary's decision not to argue traceability and redressability in her briefing *on appeal*.  *See Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1169–70 (11th Cir. 2006) (recognizing that a party may raise a jurisdictional issue for the first time on appeal).

construction. *See Robbins v. Garrison Prop. & Cas. Ins. Co.*, 809 F.3d 583, 586 (11th Cir. 2015). Those rules provide that "legislative intent is the most important factor that informs our analysis." *Quarantello v. Leroy*, 977 So. 2d 648, 651 (Fla. Dist. Ct. App. 2008). Legislative intent must be gleaned "primarily from the text of the statute," focusing on "the actual language used by the Legislature." *Id.* (internal quotation marks omitted). In examining statutory text, courts in Florida "will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute." *Id.* (internal quotation marks omitted); *see also Orange Cnty. v. Singh*, 268 So. 3d 668, 671 n.4 (Fla. 2019) ("In construing the Florida Election Code, it is necessary to read all provisions in pari materia.").

In the Election Code, the Florida Legislature has divided responsibility for administering elections among state and local officials. The Secretary of State, appointed by the governor, serves as the head of the Department of State, oversees its Division of Elections, and is charged with "general supervision and administration of the election laws." *See* Fla. Stat. §§ 15.13; 20.10(1), (2)(a). The Secretary is the "chief election officer of the state" responsible for "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws." *Id.* § 97.012(1). To maintain this uniformity, the Department of State may "adopt by rule uniform standards for the proper and equitable

93

interpretation and implementation of the requirements of chapter 97 through 102 and 105 of the Election Code." *Id.*[7]  The ballot-order statute is found in chapter 101.

Although the Secretary of State plays a role in overseeing elections across the state, most of the work in administering elections occurs at the county level. Each of Florida's 67 counties elects its own election supervisor who oversees how elections in her county are conducted. *See id.* § 98.015(1).  Each supervisor is responsible for appointing an election board, comprised of poll workers for each precinct in the county, that conducts the voting in each precinct on election day. *See id.* § 102.012(1), (4).  The supervisor's responsibilities also include "updat[ing] voter registration, enter[ing] new voter registrations into the statewide voter system, and act[ing] as the official custodian of documents" related to elector registration "and changes in voter registration status." *Id.* § 98.015(3).

Most relevant here, county election supervisors print the ballots that voters use.  Before a general election, the Department of State certifies to each county election supervisor the names of the candidates running for office that are to appear

---

[7] This provision excludes two chapters of the Election Code, 103 and 104, from the Department of State's power to adopt uniform standards for the interpretation and implementation of the requirements of the other chapters.  Chapter 103 primarily addresses the procedures that govern the electors who cast Florida's votes for President of the United States in the electoral college, Fla. Stat. §§ 103.011–103.141, and Chapter 104 sets forth criminal penalties for violating Election Code provisions, *id.* §§ 104.011–104.43.  Neither chapter is relevant to the issues before us.

on ballots in that county. *Id.* § 99.121. The Election Code then directs that the "names of such persons shall be printed by the supervisor of elections upon the ballot in their proper place as provided by law." *Id.* Based solely on this language, the majority opinion concludes that election supervisors set the order of the candidate's names on the ballot. From there, the majority opinion concludes that the Secretary of State exercises no control over how Florida election supervisors carry out their duty to order ballots because under Florida's state constitution and the Election Code the county officials are elected by the voters, and the Secretary of State does not appoint them, does not compensate them, may not suspend them, and may not remove them from office.

My concern is that the majority opinion's analysis of Florida law is incomplete because it reads provisions of Florida's Election Code in isolation, contrary to Florida's rules of statutory construction. In particular, the majority's interpretation fails to appreciate the effect of three relevant provisions of the Code, which suggest that the Florida Legislature intended for the Secretary of State to play a substantive role in setting the ballot order and overseeing how election supervisors carry out their duties in this regard.

The first provision the majority opinion largely overlooks is the one in which the Florida Legislature charges the Department of State with "adopt[ing] rules prescribing a uniform primary and general election ballot." *See id.*

95

§ 101.151(9)(a).  These rules must incorporate the requirements of § 101.151—which includes the ballot-order scheme in subsection (3)(a)—and may "prescribe additional matters" including rules governing "[i]ndividual race layout."  *See id.* § 101.151(9)(a).  Among other things, the Department's "rules must graphically depict a sample . . . general election ballot form."  *Id.* § 101.151(9)(b).  The Department's form ballots incorporate the ballot-ordering scheme.  *See, e.g.*, Form Official General Election Ballot, DS-DE 207 (eff. Sep. 12, 2018), available at https://www.flrules.org/Gateway/reference.asp?No=Ref-06441 (last accessed September 2, 2020); *see also* Fla. Admin. Code Ann. r. 1S-2.032(15)(b) (2020) (stating that the ballot form is incorporated by reference into the Secretary's rules).  This is consistent with the Secretary of State's explanation at oral argument that after the primary elections, "we have a ballot order that the [Secretary of] State provides to the [county election] supervisors . . . then they design and set the ballot per the order that is provided by the State."  Oral Argument Recording at 36:10–36:46.[8]

---

[8] A fuller quotation provides insight into the division of responsibility between the Secretary of State and county election supervisors:

> [A]fter the primary we have a ballot order that the [Secretary of] State provides to the supervisors.  And they set their ballots choosing their preferred printer, their preferred software, their preferred machines that have all been approved.  And then they design and set the ballot per the order that is provided by the state.

Oral Argument Recording at 36:10–36:46.

Indeed, the Elections Code's use of the terms "prescribing" and "prescribe" when describing the Secretary of State's power to make rules governing general election ballots and individual race layout confirms that the Florida Legislature granted the Secretary of State authority to direct election supervisors when they perform the task of preparing ballots, including the ordering of candidates. The plain meaning of "prescribe" is "[t]o make an authoritative ruling." *Prescribe*, The Oxford English Dictionary (online ed.) (last accessed April 27, 2020); *see Nehme v. Smithkline Beecham Clinical Labs., Inc.*, 863 So. 2d 201, 205 (Fla. 2003) (explaining that under Florida law, "[w]hen necessary, the plain and ordinary meaning of words can be ascertained by reference to a dictionary" (internal quotation marks omitted)). In trying to discover what the Florida Legislature intended when it adopted the Election Code, I cannot imagine that when it directed the Secretary to adopt rules incorporating the requirements of the ballot-order statute in "prescribing" general election ballots, it contemplated that county supervisors administering those elections would not be required to follow them.

This should have been enough to give the majority pause, but there is a second provision that the majority opinion misapprehends. Section 97.012(16) authorizes the Secretary of State to "[p]rovide written direction and opinions to the supervisors of elections on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State." Fla. Stat.

97

§ 97.012(16). This provision appears to flatly contradict the majority's opinion that the Secretary plays no role in and has no authority over the election supervisors' "performance of their official duties with respect to the Florida Election Code" when it comes to the Code's ballot-order provision. *Id.*

The power to issue written "direction" to election supervisors, according to the term's plain and ordinary meaning, is the power to "instruct[]" the election supervisors on "how to proceed or act" in carrying out their official duties and to give them "authoritative guidance." *Direction*, The Oxford English Dictionary (online ed.) (last accessed April 27, 2020).[9] Again, why would the legislature

---

[9] As an example, the Secretary of State recently issued a directive instructing how county election supervisors are to carry out their statutory duties under Fla. Stat. § 101.657 to select sites for early voting. *See* Fla. Dep't of State, Directive 2020-01—Early Voting Sites on College & University Campuses and Fla. Stat. 101.657(1)(a) (Apr. 2, 2020), https://dos.myflorida.com/media/702989/directive-2020-01.pdf. Under Florida law, election supervisors must operate early voting sites. *See* Fla. Stat. § 101.657(1)(a). An election supervisor may conduct early voting only at certain locations, such as a main or branch office of the election supervisor, a city hall, a permanent public library facility, a fairground, a civic center, or a courthouse. *Id.* In selecting early voting sites, the election supervisor must "provide all voters in the county an equal opportunity to cast a ballot, insofar as is practicable" and ensure that there is "sufficient nonpermitted parking to accommodate the anticipated amount of voters." *Id.*

In Directive 2020-01, the Secretary of State instructed election supervisors how to perform these duties. She explained to election supervisors that they were not required to limit early voting sites to locations that "have a certain number of nonpermitted parking" spots but must ensure that the "early voting sites collectively within a county" provide sufficient nonpermitted parking spots to accommodate the anticipated number of early voters. Directive 2020-01 at ¶¶ 7–8. She then listed factors for election supervisors to consider when determining whether the early voting sites offered sufficient parking. *Id.* at ¶ 8. Although the county election supervisors are elected county officials who operate outside the Department of State, this directive demonstrates that the Secretary of State issues binding written directions to instruct them on the performance of their official duties under the Election Code.

98

include such a provision if it intended that the election supervisors had no obligation to follow the Secretary's directions and opinions?

This brings me to the third provision of the Florida Election Code that the majority opinion neglects to afford the significance I believe is due. As the majority opinion points out, § 97.012(14) gives the Secretary of State the power to bring an action at law or in equity by mandamus or injunction to coerce a county supervisor of elections to perform any duties with respect to the Election Code or to comply with any rule adopted by the Department of State. *See* Fla. Stat. § 97.012(14). The majority opinion views this provision as evidence that the Secretary of State lacks authority over the election supervisors because she must rely on the judicial process to coerce an election supervisor to comply.

I lack the majority's confidence that this provision signals the Secretary's lack of authority over the election supervisors. I find it significant that the Florida Legislature expressly gave the Secretary of State a cause of action, particularly a *mandamus* action—an "extraordinary remedy"—to compel an election supervisor to follow the Department of State's rules. *State ex rel. Perkins v. Lee*, 194 So. 315, 317 (Fla. 1940). After all, it is well-established under Florida law that a writ of mandamus is available only when the duty sought to be coerced is "ministerial in nature" and the "respondent is under *a clear legal duty to act*." *State ex rel. Cherry v. Stone*, 265 So. 2d 56, 57 (Fla. Dist. Ct. App. 1972) (emphasis added). If

99

county election supervisors are under a clear legal duty to follow her Department's rules, then it cannot be true that the Secretary lacks the authority to direct them. Rather than supporting the majority opinion's conclusion, § 97.012(14) appears to undercut it by showing that the Secretary of State possesses the authority to compel election supervisors to perform their duties in accord with her rules and directives.[10]

Reading all of these provisions as a unified whole, I would conclude that the Code gives the Secretary of State the power to set ballot-order rules and control how election supervisors organize ballots.

### 2. Given the Secretary of State's Role in Setting Ballot Order, Any Injuries Arising from the Ballot-Order Scheme Are Traceable to, and Redressable in Litigation Against, the Secretary.

If the majority opinion is wrong about the scope of the Secretary of State's authority under Florida law, that would mean that the Committees' injuries were traceable to the Secretary and redressable in litigation against her. Let me explain. First, traceability: If as I have shown the Secretary plays a role in ordering

---

[10] It is true that the Secretary of State does not appoint county election supervisors and has no power to suspend them or remove them from office, but I think the majority infers too much from these facts. The Florida Legislature designed a system of government in which the Secretary of State lacks these particular powers but nonetheless possesses the authority to oversee and direct how local officials carry out their duties, to ensure compliance with state election law and maintain uniformity of election procedures throughout the state.

Furthermore, although mandamus may seem like an indirect and inefficient remedy, after a more fulsome look at the Secretary's authority, I think it is reasonable to assume that the mandamus power would need to be exercised only rarely.

candidates' names on general election ballots following the ballot-order statute, any injury the Committees suffered as a result of Florida's ballot-order law would, at a minimum, "flow indirectly from" the Secretary's actions. *Focus on the Family*, 344 F.3d at 1273 (recognizing that the traceability inquiry is "concerned with something less than the concept of proximate cause" (internal quotation marks omitted)).

The fact that the Committees' injuries also could be fairly traced to the county election supervisors does not change the analysis. An injury cannot be "the result of the ***independent*** action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (emphasis added) (alterations adopted) (internal quotation marks omitted). But standing "is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties." *Loggerhead Turtle*, 148 F.3d at 1247.

Now, redressability: Any injury arising from the challenged law would have been redressed by the district court's injunction, which, among other things, directed the Secretary of State not to "enforce . . . the ballot order scheme described in section 101.151(3)(a)." Doc. 202 at 72. Under this injunction, the Secretary would have to cease providing county election supervisors with form ballots and promulgating rules and regulations that effectuated the Election Code's ballot-order scheme—meaning that when preparing ballot forms the Secretary

101

would have to use a different method for ordering the candidates for each office. She could have selected any method other than putting candidates from the governor's political party first in every race. As the Secretary has explained, her department provides each county election supervisor with a list of candidates in the order required by the ballot-order statute. Given that the Secretary provides the lists and oversees and directs how the county election supervisors carry out their duties, it seems "likely, as opposed to merely speculative" that any injury the committees suffered as a result of enforcement of the ballot-order statute would be redressed by the district court's relief. *Loggerhead Turtle*, 148 F.3d at 1253 (quoting *Lujan*, 504 U.S. at 561).

The majority opinion's primary argument about traceability and redressability is that the Secretary of State lacks a sufficient connection to Florida's ballot-order scheme because she plays no role in setting ballot order and exercises no control over county election supervisors who set ballot order. As I explained above, the majority opinion reaches this conclusion only by ignoring, for the most part, three key provisions of Florida's Election Code. When the majority opinion finally gets around to acknowledging these three provisions, it shifts gears and raises an entirely new argument—that when a state official exercises authority conferred on her by state law to promulgate rules and regulations under a statute, the official does not "enforce" the statute. Maj. Op. at 39 (emphasis omitted)

102

(internal quotation marks omitted). The majority opinion warns that if we were to conclude that the Secretary's rule-making power gives her the authority to enforce the Election Code, "plaintiffs could presumably also challenge a law by suing the legislators who enacted it instead of the officials who execute it." *Id.*

I disagree that the statutory scheme reveals that the Secretary of State does not enforce the ballot-order statute. To me, the Secretary of State's role in elections, specifically ballot ordering, points more clearly to the conclusion that she enforces the statute. The Secretary prepares and provides to county election supervisors uniform ballot forms that incorporate the ballot-order scheme, promulgates rules under the Election Code including the ballot-order statute, and oversees how county election supervisors carry out their duties, all in fulfilling her responsibility (hers alone) to maintain uniformity in the interpretation and implementation of the Code throughout the state. *See* Fla. Stat. §§ 97.012(1), (14), (16); 101.151(9). The majority opinion accepts that the Secretary "instruct[s]" supervisors about ballot order. Maj. Op. at 40–41. Yet it cites no authority supporting its conclusion that a state official afforded these sorts of responsibilities does not enforce the statute. Nor does it cite any authority suggesting that an executive-branch state official who carries out such responsibilities has a similar relationship to the enforcement of the statute as a state legislator who voted to enact it.

103

Given all of this, I think the better conclusion is that the Secretary of State's enforcement connection with the ballot-order statute is sufficient to establish that any injury the Committees suffered "flow[ed]" at least "indirectly" from her actions and that it is "likely" that any such injury would be redressed by injunctive relief against the Secretary. *Focus on the Family*, 344 F.3d at 1273. I recognize that in this case the issues of traceability and redressability both turn on the Secretary's role in enforcing the ballot-order statute. But this is hardly surprising because often "redressability and traceability overlap as two sides of a causation coin." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005) (internal quotation marks omitted); *see also Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997) (same).

To support its argument that the Secretary of State lacks a sufficient connection to the statute's enforcement, the majority opinion relies on our recent en banc decision in *Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019) (en banc). *Lewis* concerned the Birmingham city council's passage of an ordinance raising the minimum wage for workers in the city. *Id.* at 1292. In response, the Alabama Legislature adopted a statewide minimum-wage law, effectively nullifying Birmingham's ordinance. *Id.* at 1292–93. Employees who worked in Birmingham, along with several public interest groups, sued the Attorney General of Alabama, claiming racial discrimination under multiple

104

theories. The plaintiffs sought as relief a declaration that the state statute was unconstitutional and an injunction ordering the Attorney General to notify the legislature and the public of the statute's invalidity. *Id.* at 1294–95. In considering traceability, we concluded that the Attorney General did not enforce the statute because it "envision[ed] no role for the Attorney General." *Id.* at 1299. And in reviewing redressability, we reasoned that because the "Attorney General played no enforcement role whatsoever" with respect to the minimum wage law, a judgment against the Attorney General would not "directly redress" the plaintiffs' injury. *Id.* at 1301–02 (internal quotation marks omitted).

The majority opinion argues that our reasoning in *Lewis* shows that the Secretary of State does not enforce the ballot-order statute. But this case is not *Lewis* because here the Secretary of State plays a substantial role in the statutory scheme at issue. *Lewis* does not help the majority in going further; once we concluded that the Alabama Attorney General had no role in enforcing the statute, we did not address the type of enforcement role a state official must have to satisfy traceability or redressability.

The majority opinion seeks to fill this silence by making new rules about the role a state official must have with respect to a challenged statute to establish traceability and redressability. But neither Supreme Court nor this Circuit's precedent imposes such a heavy burden on plaintiffs challenging state laws. I note

105

further that when confronted with cases in which defendant state officials carried out similar responsibilities with respect to challenged laws, our sister circuits have concluded that the officials were enforcing the law sufficiently to confer standing. *See OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017); *Calzone v. Hawley*, 866 F.3d 866 (8th Cir. 2017).

In a case strikingly similar to this one, the Fifth Circuit considered whether the plaintiff established traceability and redressability for standing purposes in a lawsuit against Texas's secretary of state. The court resolved both issues by concluding that the secretary had a sufficient "enforcement connection with" a challenged state statute regarding the administration of elections.[11] *See OCA-Greater Houston*, 867 F.3d at 613-14 (internal quotation marks omitted). When a citizen with a limited ability to communicate in English sought to have her son serve as an interpreter for her while she voted, local officials refused, citing a Texas statute allowing an interpreter to assist a voter only if the interpreter was registered to vote in the voter's county of residence. *Id.* at 607–09. In a lawsuit against the secretary of state challenging the Texas statute on federal preemption grounds, *id.* at 609, the secretary argued that the voter's injury was neither fairly

---

[11] In an *amicus* brief filed in this case, Texas emphasized the similarities in how Florida and Texas have chosen to administer elections. In both states local officials, who operate outside the department of state and may not be removed from office by the secretary of state, prepare ballots, while the secretary of state is tasked with obtaining and maintaining uniformity in the application of the state's election laws.

106

traceable to him nor redressable in a lawsuit against him and instead was the result of actions by county officials who applied the statute to prohibit her son from serving as an interpreter. *Id.* at 612–13. The Fifth Circuit rejected his argument.

To determine whether the plaintiff's injury was fairly traceable to the secretary and redressable in litigation against the secretary, the court considered whether under Texas law the secretary had a role in enforcing the challenged statute. *See id.* at 613–14. The court explained that a state official had "no enforcement connection with the challenged statute" when he had no "duty or ability to do anything" with respect to the challenged law. *Id.* (emphasis omitted) (internal quotation marks omitted). Because by Texas law the secretary of state was the "chief election officer of the state" and was "instructed by statute to obtain and maintain uniformity in the application, operation, and interpretation" of Texas's election code, the court concluded, he had a sufficient "enforcement connection with the challenged statute" in the election code to establish traceability and redressability. *Id.* at 613–14 (internal quotation marks omitted).

Florida's Secretary of State enjoys the same powers and responsibilities as the Texas secretary. At the risk of beating a dead horse, I reiterate that she serves as Florida's "chief election officer," Fla. Stat. § 97.012; is instructed by statute to "obtain and maintain uniformity in the interpretation and implementation" of Florida's Election Code, *id.* § 97.012(1); and is empowered by statute to

107

promulgate rules to implement the statute in questions, *id.* § 101.151(9). The majority opinion's holding that she lacks a sufficient enforcement connection with the ballot-order statute to satisfy traceability and redressability is directly contrary to the Fifth Circuit's holding in *OCA-Greater Houston*.

The majority opinion's determination that the Secretary of State does not enforce the ballot-order statute also is in tension with a decision from the Eighth Circuit, albeit one outside of the election context. The Eighth Circuit held that for the purpose of standing a state official played a sufficient role in enforcing a challenged statute when state law authorized her to promulgate rules and regulations to implement the statute. *See Calzone*, 866 F.3d at 870. In *Calzone*, a truck driver sued, among others, the superintendent of Missouri's state highway patrol after the driver was cited for refusing to permit a state highway patrol officer to inspect his vehicle under a Missouri law that authorized officers to stop any commercial vehicle to police its compliance with size and weight restrictions. *Id.* at 869. The driver challenged the state statute as unconstitutional. *Id.*

On appeal, the Eighth Circuit held that the driver had standing to sue the superintendent. *Id.* at 870. Although the superintendent was not involved in the stop or citation, the court held that the driver's injuries were traceable to her and redressable in a lawsuit against her because the driver was stopped under the state statute that authorized patrol officers to stop commercial vehicles, and the

108

superintendent had adopted rules and regulations to implement the statute.  *Id.*

(citing Mo. Rev. Stat. § 304.230.1).  The court accepted that the superintendent's

adoption of rules and regulations led the officer to "implement the statute by

conducting vehicle inspections," which caused the driver's injury.  The driver's

injuries thus were traceable to her and redressable against her.[12]  *Id.*  Under

*Calzone*'s reasoning, the fact that Florida law authorizes the Secretary of State to

promulgate rules and regulations to implement the ballot-order statute is sufficient

to establish that she enforces the law.

The majority opinion raises an additional argument regarding redressability:

that an injunction directed to the Secretary of State would not redress any injuries

because the relief would not alter the conduct of the county election supervisors

who print the ballots.  But this argument is flawed and creates yet another circuit

split.  According to the majority opinion, there is nothing to suggest that any relief

directed to the Secretary would change how county election supervisors prepare

their ballots.  I disagree.  If the district court directed the Secretary of State to cease

providing ballot forms that list candidates from the governor's party first for every

---

[12] The Eighth Circuit drew the conclusion that the superintendent's promulgation of rules and regulations led the highway patrol officer to conduct the stop, even though another provision of the state statute separately authorized the officers to conduct suspicionless stops, meaning that the officer could have conducted the stop regardless of any rules or regulations the superintendent adopted.  *See Calzone*, 866 F.3d at 870–71 (citing Mo. Rev. Stat. § 340.230.2).  Despite the highway patrol officers' independent statutory authorization to perform suspicionless stops, the court concluded that the driver's injury bore a sufficient causal connection to the superintendent's actions to be traceable to and redressable against her.  *See id.* at 870.

109

office, it is likely that county election supervisors would follow the Secretary's

official guidance under the authority granted her by state law.  True, I cannot

definitely say that when faced with a conflict between the Secretary of State's

directions and the statute, the county election supervisors would not reverse their

customary course, stop relying on form ballots or lists from the Secretary, ignore

the Department of State's rules and directives, and follow the statute instead.

Maybe in practice some would.  But that does not make redress from the court's

order "speculative" as a legal matter.[13]

In reaching the opposite conclusion, the majority opinion splits from the

Fourth Circuit, which—when faced with analogous facts—found a sufficient

likelihood that local officials would follow the state official's instructions,

regardless of the statute.  *Bostic v. Schaefer*, 760 F.3d 352, 370–71 (4th Cir. 2014).

In *Bostic*, two same-sex couples brought a constitutional challenge to Virginia's

state statutes and state constitutional amendment that prohibited same-sex

marriage.  *Id.* at 367–68.  The couples sued two defendants:  the clerk of a circuit

---

[13] To bolster its opinion, the majority opinion cites to the trial testimony of a single former county election supervisor that he applied the ballot statute because it is the law.  The former election supervisor gave this testimony while recounting that voters occasionally asked him why Republican candidates appeared at the top of their ballots.  He would respond to the voter that the order was set by the statute and he was applying the statute.  No testimony at trial addressed what this or any other county election supervisor would do if the ballot order from the Secretary of State did not follow the statute.  Regardless, such testimony is irrelevant to the legal question of whether state law gives the Secretary enforcement authority over county election supervisors sufficient to meet the standards for traceability and redressability.

110

court, who had denied one of the couples a marriage license, and the state registrar

for vital records, who was responsible for developing a marriage license

application form and distributing it to circuit court clerks throughout Virginia. *Id.*

at 369, 371.

On appeal, the Fourth Circuit held that the couples had standing to sue the

state registrar for vital records because the registrar's "promulgation of a marriage

license application form that does not allow same-sex couples to obtain marriage

licenses" resulted in the couples being denied marriage licenses.[14] *Id.* at 371–72.

The Fourth Circuit determined that the registrar was "enforc[ing]" Virginia's

marriage laws by developing and circulating license forms that did not allow same-

sex couples to obtain marriage licenses. *Id.* at 372. The court explained that the

registrar's actions "resulted in" local officials denying marriage license requests

from same-sex couples, *id.*—despite the fact that if the registrar had distributed

forms that permitted same sex-couples to apply for marriage licenses, Virginia law

still would have prohibited local officials from issuing marriage licenses to same-

sex couples, *see id.* at 367–68 (cataloguing Virginia laws prohibiting same-sex

marriage).

_____

[14] The Fourth Circuit also concluded that the plaintiffs had standing to sue the clerk who had denied one of the couples a marriage license. But the court made clear that the inclusion of the clerk as a defendant did not establish that the couples had standing to sue the registrar, because the standing requirements had to be satisfied as "to each defendant." *Bostic*, 760 F.3d at 370–71.

111

Applying the majority opinion's logic, even if a federal court ordered the Virginia registrar to cease issuing marriage application forms that barred same sex marriage, a local clerk who issued marriage licenses could have refused to issue a same-sex couple a marriage license on the ground that Virginia law continued to bar same-sex marriages. *See id.* at 368. But the Fourth Circuit did not see it that way. To state the obvious, the Secretary of State plays a similar role in issuing sample ballots and lists of candidates as the Virginia registrar did in issuing marriage license forms.

I disagree with the majority opinion's interpretation of Florida law and resulting conclusions about the role the Secretary of State plays in implementing Florida's ballot-order statute. Because in fulfilling her duties the Secretary of State enforces the ballot-order statute, she has a sufficient connection to the statutory scheme to satisfy traceability and redressability. The majority opinion's argument that a state official who performs these duties does not "enforce" the law lacks any support in our precedent and conflicts with decisions from several other circuits.

To wrap up, the Committees suffered actual injury that can be traced to the Secretary of State and are redressable in litigation against her. I thus would conclude that they have standing to sue.

**II.    The Committees' Challenge to the Ballot-Order Statute Does Not Raise a Nonjusticiable Political Question.**

The majority opinion also announces a fourth reason why the district court should have dismissed the case for lack of jurisdiction:  the case presents a non-justiciable political question.  This holding cannot be squared with the Supreme Court precedent on which the majority relies.

We often discuss Article III's case-or-controversy requirement in the context of deciding whether a plaintiff has standing or whether her claims are ripe or moot.  But another aspect of the requirement is that a federal court lacks the authority to decide a claim that involves a "political question."  *Rucho*, 139 S. Ct. at 2494.

In general, a federal court must "decide cases properly before it."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012); *see Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (stating it is "the province and duty of the judicial department to say what the law is").  The Supreme Court has recognized a "narrow exception" to this rule, known as the political question doctrine.  *Zivotofsky*, 566 U.S. at 195.

A controversy involves a "political question" when (1) "there is a textually demonstrable constitutional commitment of the issue to a coordinate political department;" or (2) "a lack of judicially discoverable and manageable standards for

113

resolving it." *Id.* (internal quotation marks omitted). When a controversy presents a political question, it is said to be "outside the courts' competence and therefore beyond the courts' jurisdiction." *Rucho*, 139 S. Ct. at 2494; *see also Zivotofsky*, 566 U.S. at 195 (stating that "a court lacks the authority" to decide a dispute involving a political question). The doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962).

We focus today on the second category of cases that present a political question: those for which a judicially discoverable or manageable standard to resolve the controversy is lacking. I would hold that there exists a well-established judicially discernible and manageable standard to review the Committees' challenge to the ballot-order statute; the majority merely rejects it without good reason. I reach this conclusion for two independent reasons.

First, the Supreme Court's decision in *Mann v. Powell*, 398 U.S. 955 (1970), compels the conclusion that there is a judicially discernible and manageable standard available to review a challenge to a ballot-order law or practice. In issuing a summary affirmance in *Mann*, the Court necessarily rejected the argument that a challenge to a ballot-order scheme raised a nonjusticiable political question because there was no judicially discernible and manageable standard for reviewing the claim. *Mann* controls, and it requires us to reach the same conclusion in this case.

114

Second, even if we were free to ignore *Mann*—which, I emphasize, we are not—I still would conclude that a judicially manageable standard is available to review the Committees' challenge to the ballot-order statute. We can (and should) review the Committees' claim by weighing the character and magnitude of the asserted constitutional injury against the state's justification for the burden imposed by the challenged law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Because there exists a "well developed and familiar" standard to review a claim like this one, I would conclude that the judicially-manageable-standard requirement is met here. *See Baker*, 369 U.S. at 226. Given the availability of a judicially manageable standard, we have a "responsibility to decide" the case before us. *Zivotofsky*, 566 U.S. at 194. I would not dodge our constitutional duty.

**A.    The Supreme Court's Summary Affirmance in *Mann* Compels the Conclusion That There Is a Judicially Manageable Standard Available to Resolve a Challenge to a Ballot-Order Scheme.**

The Supreme Court's summary affirmance in *Mann* establishes that the political question doctrine does not bar the Committees' challenge. In *Mann*, several Illinois candidates and voters filed a lawsuit in district court to challenge the secretary of state's practice for ordering candidates' names on election ballots. *Mann v. Powell*, 314 F. Supp. 677 (N.D. Ill. 1969), *aff'd*, 398 U.S. 955 (1970). Illinois law directed the secretary of state to place candidates on the primary ballot

115

in the order in which their nominating petitions were received. *Id.* at 678. When candidates submitted petitions simultaneously—say, when the registration period opened—Illinois law was silent about how the secretary should break the tie. *Id.* at 678. The secretary adopted a practice of breaking ties in favor of incumbents. *Id.* at 678–79. The plaintiffs' lawsuit challenged this practice. *Id.* at 677–78.

A three-judge district court determined that the secretary's method of breaking ties was unconstitutional because it was a "purposeful and unlawful invasion of plaintiffs' Fourteenth Amendment right to fair and evenhanded treatment." *Id.* at 679. The district court entered a temporary injunction prohibiting the secretary from breaking ties by using "any means other than a drawing of candidates' names by lot or other nondiscriminatory means by which each" candidate would "have an equal opportunity to be placed first on the ballot." *Id.* The court followed the temporary injunction with a permanent one. *See Mann v. Powell*, 333 F. Supp. 1261, 1267 (N.D. Ill. 1969). The secretary appealed directly to the United States Supreme Court. *See* 28 U.S.C. § 1253 (permitting direct appeal to Supreme Court from a three-judge district court's order granting an interlocutory or permanent injunction). The Supreme Court summarily affirmed the district court, leaving the permanent injunction in place. *See Mann*, 398 U.S. 955.

The Supreme Court's precedential summary affirmance in *Mann* binds us to conclude that the Committees' challenge to Florida's ballot-order statute does not raise a political question. The Supreme Court has cautioned that "lower courts are bound by summary decisions by this Court until such time as the Court informs them that they are not." *Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975) (alterations adopted) (internal quotation marks omitted); *accord* Bryan A. Garner et al., *The Law of Judicial Precedent* § 21, at 219 (2016) ("[T]he one-line orders embodied in summary affirmances bind lower courts . . . ."). We therefore must tread carefully when we decide that a summary affirmance is not binding. It is true that a summary affirmance does not necessarily mean that the Court adopted the rationale of the district court's order. *See Mandel v. Bradley*, 432 U.S. 173, 176 (1976). But it does bind lower courts, the Supreme Court has said, "from coming to opposite conclusions on the precise issues presented and necessarily decided by" the Court in the action that resulted in the summary affirmance. *Id.*

The majority opinion does not argue with my account of how we are to review a Supreme Court summary affirmance. *See* Maj. Op. at 65 (conceding that, according to the Supreme Court's directions, we must read into the summary affirmance that which was "necessarily decided" in the earlier action (internal quotation marks omitted)). And the majority agrees that we look to the

117

jurisdictional statement[15] filed in the case to determine the issues that were

presented and necessarily decided in a case that was summarily affirmed. *See*

*Mandel*, 432 U.S. at 176; *see also Ill. State Bd. of Elections v. Socialist Workers*

*Party*, 440 U.S. 173, 182 (1979) (explaining that Supreme Court's summary

affirmance did not necessarily decide an issue that was only "alluded" to and not

"directly address[ed]" in the jurisdictional statement).[16]

Based on the jurisdictional statement filed in *Mann*, there can be no doubt

that the Supreme Court necessarily decided the question of whether a challenge to

a ballot-order scheme raises a political question. The political question issue was

squarely presented in the jurisdictional statement. The Illinois secretary of state

framed the threshold question on appeal as whether "the action presents a dispute

within the judicial power" and raised specifically whether the "political question

doctrine" barred federal courts from reviewing the plaintiffs' challenge to the

---

[15] When a party brings a "direct appeal" from a United States district court, it must first file a "jurisdictional statement" with the Supreme Court. Rules of the Supreme Court of the United States, Rule 18(3). After reviewing the jurisdictional statement and any filings from the appellee, the Court decides whether to dispose of the case summarily or submit it for briefing and oral argument. *Id.* Rule 18(12).

[16] Above I discuss how a Supreme Court summary affirmance binds lower courts. A summary affirmance does not bind the Supreme Court itself in the same way. The Court may in a later case revisit an issue necessarily decided in a summary affirmance. *See Lunding v. N.Y. Tax Appeals Tribunal*, 522 U.S. 287, 307 (1998). But the fact that the Supreme Court retains the right to revisit in a future case an issue necessarily decided by an earlier summary affirmance does not release us, a lower court, from the binding effect of the summary affirmance. *See United States v. Blaine Cnty.*, 363 F.3d 897, 904 (9th Cir. 2004) (rejecting argument that Supreme Court's summary affirmance was not binding on a federal appellate court).

118

ballot-order practice.  Jurisdictional Statement, *Powell v. Mann*, 1970 WL 155703, at *6, 21 (1970) (internal quotation marks omitted).  The secretary argued that there was no "judicially manageable" standard to review a challenge to how he ordered ballots because the question turned on "subjective . . . notions of political fairness."  *Id.* at *21, 32.  And he warned that allowing a federal court to review how a state organized its ballots would create "an unprecedented over-extension of federal judicial Power into the internal political affairs of a State."  *Id.* at *18.  The secretary thus "presented" the "precise issue"—and relied on essentially the same reasons[17]—as the majority opinion does in concluding that the ballot-order case before us presents a non-justiciable political question.  *Mandel*, 432 U.S. at 176.  So not only was the applicability of the political question doctrine presented in *Mann*, but the secretary also explicitly presented the sub-issues of whether there exists a judicially discernible and manageable standard for reviewing a ballot-order challenge and whether deciding such a challenge would present an unprecedented extension of federal power into an area traditionally reserved to the states.[18]

---

[17] Of course, *Rucho* was decades in the future when the jurisdictional statement was filed, but the reasons the secretary advanced for applying the political question doctrine were remarkably similar to the ones the Court relied on in *Rucho*.

[18] The majority tries to distinguish *Mann* on the ground that the Illinois law gave the secretary of state "unfettered discretion" to set the order of candidates' names on ballots, whereas Florida's ballot-order law mandates a particular order.  Maj. Op. at 66–67.  But the Illinois secretary of state's argument that the political question doctrine barred judicial review of the ballot-order challenge did not turn on the fact that the Illinois law afforded him discretion to determine ballot order.  *See* Jurisdictional Statement, *Mann*, 1970 WL 155703, at *6 (framing

And we know that the Supreme Court necessarily decided the issue because justiciability is a question of jurisdiction that the Court had to address before reaching the merits. When the Supreme Court summarily affirmed the district court's order *granting* injunctive relief, the Court necessarily rejected the secretary of state's argument that federal courts lacked jurisdiction to review a challenge to a ballot-order practice because it presented a nonjusticiable political question. If the Court had agreed with the secretary on this issue, the Court would have had to vacate the injunction. *See, e.g.*, *Rucho*, 139 S. Ct. at 2508 (reflecting that when the Supreme Court decides that a case presents a political question, the appropriate disposition is to vacate the district court's judgment granting relief and remand with instructions to the district court to dismiss for lack of jurisdiction).

The Supreme Court's summary affirmance in *Mann* necessarily tells us, then, that the Court rejected the secretary's argument, squarely presented to the Court in the jurisdictional statement, that a challenge to a ballot-order scheme raises a nonjusticiable political question.[19] *See Mandel*, 432 U.S. at 176

---

question as whether "the political question doctrine permit[s] federal judicial cognizance of political cases, involving inter- or intra-party election disputes").

[19] I am not saying that a decision about jurisdiction is essential to every Supreme Court summary affirmance. For example, say a three-judge district court dismissed a plaintiff's challenge to an election law on the ground that it presented a political question, the plaintiff appealed, and in her jurisdictional statement she argued both that the court had jurisdiction and that she should prevail on the merits. If the Supreme Court issued a summary affirmance, a lower court could not assume that the court decided the political question issue against the plaintiff because the Court could have affirmed the dismissal either because the plaintiff's claim

120

(explaining that a summary affirmance rejects "the specific challenges presented in the statement of jurisdiction").  The unescapable conclusion is that the Supreme Court rejected the very position that the majority opinion takes here.  We therefore are bound by *Mann* to hold that a challenge to a ballot-order scheme does not present a nonjusticiable political question.  *See* Garner et al., *The Law of Judicial Precedent* § 6, at 86  ("[I]f tacitly assumed rules or principles are so essentially involved in the decision that the particular judgment couldn't logically have been given without recognizing and applying them, they do become authoritative.").

**B.     Even if *Mann* Does Not Control the Question, a Judicially Manageable Standard Is Available to Resolve this Ballot-Order Challenge.**

Our analysis of the political question doctrine should start and end with *Mann*.  But even if *Mann* did not bind us, I would still conclude that there is a judicially manageable standard available to review the Committees' challenge to the ballot-order law.  I would apply the test from *Baker*, that there is a judicially discernible and manageable standard available if there is a well-developed and familiar legal framework we can use to decide whether the challenged scheme is unconstitutional.  *Baker*'s test is met here because we can use the well-established *Anderson-Burdick* framework to determine whether the ballot-order statute is unconstitutional.  Under the *Anderson-Burdick* framework, we would weigh the

presented a political question and thus the court lacked jurisdiction or the court had jurisdiction but the plaintiff's claim failed on the merits.

121

character and magnitude of the injury to the Committees' associational rights against Florida's proffered justifications for the burdens imposed by the law. *See Anderson*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434. *Anderson-Burdick* provides a judicially manageable standard for reviewing the Committees' challenge.

### 1. The Supreme Court Has Applied Two Distinct Tests to Determine Whether a Judicially Manageable Standard Is Available to Review an Election Law Challenge.

To determine whether a judicially manageable standard is available to review the Committees' challenge to the ballot-order statute, the first step is to identify the test that the Court should use to answer that question. The Supreme Court in *Baker* and *Rucho* used two very different tests to determine whether a judicially manageable standard was available to review the plaintiffs' claims. In *Baker* the Court applied an expansive standard that treated the question of whether there was a judicially manageable standard as a low hurdle that was cleared because there was a generally available standard to review claims, like the plaintiffs', arising under the Equal Protection Clause. In *Rucho*, the Court used a more searching inquiry in concluding that there was no judicially manageable standard available to review a constitutional challenge to partisan gerrymandering. Importantly, the Court did not overrule *Baker* in *Rucho*. The two decisions are not inconsistent; a careful reading of both reveals that the *Baker* test applies generally

122

and the *Rucho* test applies only when particularly weighty separation-of-powers concerns demand a tighter standard.

The Court first considered the test for deciding whether there was a judicially manageable standard in *Baker*. The plaintiffs challenged Tennessee's legislative apportionment plan under which district lines had not been redrawn for more than 60 years. *See* 369 U.S. at 191–92. Tennessee's legislature refused to adopt a new districting plan even though its outdated districting map created substantial disparities in the population size of each state representative's district. *See id*. at 254 (Clark, J., concurring). The plaintiffs alleged that the plan denied them equal protection "by virtue of the debasement of their votes." *Id.* at 187 (majority opinion) (internal quotation marks omitted). The district court dismissed the action, concluding that it presented a political question about the "distribution of political strength for legislative purposes." *Id.* at 197 (internal quotation marks omitted).

The Supreme Court reversed, holding that the equal protection claim did not raise a political question because there was a judicially manageable standard available to resolve the plaintiffs' challenge to the state's apportionment plan. *Id.* at 209, 217. The Court concluded that a judicially manageable standard was available because "[j]udicial standards under the Equal Protection Clause" were "well developed and familiar." *Id.*; *see also Zivotofsky*, 566 U.S. at 201 (holding a

123

judicially manageable standard was available when the parties' arguments about the plaintiff's claim "sound[ed] in familiar principles of constitutional interpretation").

In reaching its conclusion, the Court in *Baker* referred only to the framework generally applied in deciding equal protection claims. Notably, the Court reached this conclusion without identifying the more specific standards that later would come to be used to review one-person, one-vote claims. The Court would not announce the standards used to review those claims for more than two years, in *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964), and *Reynolds v. Sims*, 377 U.S. 533, 577 (1964). *See Vieth v. Jubelirer*, 541 U.S. 267, 310 (2004) (Kennedy, J., concurring) (observing that the Court held in *Baker* that there was a judicially manageable standard available "before the more specific standard with which we are now familiar emerged to measure the burden of nonequipopulous districting causes on representational rights").

Last year, in *Rucho*, the Court took a different approach to decide whether there was a judicially manageable standard available to review a partisan-gerrymandering claim. In *Rucho*, plaintiffs challenged North Carolina and Maryland's congressional districting maps as unconstitutional partisan gerrymanders. 139 S. Ct. at 2491. State legislators in North Carolina had redrawn the state's congressional districts to maximize Republican representation while

Maryland state legislators had redrawn their state's congressional districts to maximize Democratic representation.[20]  *Id.* at 2491–93.  The plaintiffs alleged that the gerrymandered districts violated, among other constitutional provisions, the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 2491.  In each case, after a three-judge district court concluded that the redistricting plan was an unconstitutional partisan gerrymander, the defendants appealed directly to the Supreme Court.  *See id.* at 2493.  The Supreme Court vacated the judgments in both cases, holding that the federal courts lacked jurisdiction to decide claims of excessive partisanship in redistricting because reviewing the claims would require federal courts to decide political questions. [21]

The Court characterized the question before it as "whether there is an appropriate role for the Federal Judiciary in remedying the problem of partisan gerrymandering."  *Id.* at 2494 (internal quotation marks omitted).  The Court did

---

[20] State legislators effectuate partisan gerrymanders by drawing "cracked" and "packed" districts.  *See Rucho*, 139 S. Ct. at 2492.  In a cracked district, a party's supporters are divided among multiple districts so that they fall short of a majority in each district.  *Id.*  In a "packed district," a party's supporters are highly concentrated in a single district so that the party's candidate wins in that district by a large margin, "wasting" votes that could have improved the party's chances in other districts.  *Id.* (internal quotation marks omitted).

[21] *Rucho* was decided by a narrow majority.  Four justices strongly dissented, criticizing the majority's decision for barring judicial review of challenges to unconstitutional partisan gerrymanders, which "violated the constitutional rights of hundreds of thousands of American citizens."  *Rucho*, 139 S. Ct. at 2524 (Kagan, J., dissenting).  The dissenters would have held that a partisan gerrymandering claim did not present a political question because federal courts had, in fact, developed standards to review these claims that allowed for "neutral and manageable oversight."  *Id.*

not use *Baker*'s straightforward inquiry to determine whether there was a judicially manageable standard by asking whether there were existing standards for evaluating the plaintiffs' claims under the First Amendment and Equal Protection Clause. Instead, the Court applied a different test to determine whether there was a judicially manageable standard available to review partisan gerrymandering claims. Looking to Justice Kennedy's earlier concurrence in *Vieth*, the Court declared that to be judicially manageable, any standard had to rest on a "limited and precise rationale'" and be "clear, manageable, and politically neutral." *Id.* at 2498 (quoting *Vieth*, 541 U.S. at 306–08 (opinion of Kennedy, J.)).

The Court gave no indication that this test would apply any time a court was deciding whether there was a judicially manageable standard. Instead, the Court cautioned that these "careful constraints" applied to partisan gerrymandering claims due to their significant implications for the separation of powers. *Id.* The Court advanced two reasons why the separation of powers was uniquely implicated in the partisan gerrymandering context.

First, the Court reasoned, "the opportunity to control the drawing of electoral boundaries through the legislative process of apportionment is a critical and traditional part of politics in the United States." *Id.* (alteration adopted) (internal quotation marks omitted). The Court offered a lengthy history of the practice of partisan gerrymandering in America, which showed that the process "was known

126

in the Colonies prior to Independence, and the Framers were familiar with it at the time of the drafting and ratification of the Constitution." *Id.* at 2494. Aware of the problems associated with partisan gerrymandering, in drafting the Constitution, the Court said, the Framers "assign[ed] the issue to the state legislatures, expressly checked and balanced by the Federal Congress" and never suggested that the "federal courts had a role to play" in reviewing legislative decisions regarding partisan gerrymandering. *Id.* at 2496.

Again drawing from Justice Kennedy's concurrence in *Vieth* that discussed *Baker*, the Court advanced a second reason for declining to apply a more "expansive standard" to determine whether there was a judicially manageable standard available to review partisan gerrymandering claims. The Court said that "the correction of all election district lines drawn for partisan reasons would commit federal and state courts to an unprecedented intervention in the American political process." *Id.* at 2498 (quoting *Vieth*, 541 U.S. at 306 (opinion of Kennedy, J)). Allowing courts to review partisan gerrymandering claims would work an unprecedented intervention, the Court explained, because although the Court had heard several partisan gerrymandering cases, it had "not previously struck down a districting plan as an unconstitutional partisan gerrymander." *Id.* at 2491. In these cases, the Court had "struggled without success" to identify a standard by which to review partisan gerrymandering claims. *Id.* Because there

127

was no precedent for courts reviewing the inherently legislative process of partisan gerrymandering, the Court emphasized that "*in such circumstances*" it was "vital . . . that the Court act only in accord with *especially clear standards*." *Id.* at 2498 (emphasis added). And allowing judicial review of the legislature's process of drawing district lines would result in judicial intervention that "would recur over and over again around the country with each new round of districting, for state as well as federal representatives." *Id.* at 2507.

Applying this heightened test, the Court concluded that there was no standard grounded in a limited and precise rationale that was clear, manageable, and political neutral. To decide a partisan gerrymandering claim, a court would have to make judgments "about how much representation political parties *deserve*" and then "rearrange the challenged districts to achieve that end." *Id.* at 2499 (emphasis in original). The Court said that "federal courts [we]re not equipped" to make these types of decisions, which required courts "to apportion political power as a matter of fairness." *Id.*[22] The Court thus concluded that there was no judicially manageable standard available.

Taking a step back, we see that in *Baker* and *Rucho* the Supreme Court has applied two distinct tests to determine whether there was a judicially manageable

---

[22] The Court addressed in detail why there was no standard grounded in a limited and precise rationale that was clear, manageable, and political neutral to determine whether a redistricting plan was "fair." I discuss this portion of the *Rucho* opinion in Part II-B-3 below.

standard available to review constitutional challenges in the election context. In *Baker*, the Court asked whether only there was a "well developed and familiar" framework to review the claim. 369 U.S. at 226. In contrast, the Court in *Rucho* engaged in a much more robust inquiry by asking whether the particular standard to be applied to review the claim was grounded in a "limited and precise rationale" and was "clear, manageable, and politically neutral." 139 S. Ct. at 2498 (internal quotation marks omitted).

Rucho gives us clues for how to harmonize these two tests. *Rucho* did not overrule *Baker*'s standard; instead, it distinguished *Baker* because the claims in that case could be "decided under basic equal protection principles," whereas partisan gerrymandering claims could not. *See id.* at 2496. Instead of following *Baker*, the Court applied a more demanding test because committing the political process of drawing districting lines to the legislative branch has been a "critical and traditional part of politics in the United States" and having federal courts review this legislative process "would commit federal and state courts to an unprecedented intervention in the American political process." *Id.* at 2498 (alteration adopted) (internal quotation marks omitted). Consistent with the Supreme Court's reasoning, we should apply *Rucho*'s more demanding test for deciding whether a judicially manageable standard is available *only* when (1) committing the challenged procedure to the legislative branch has been a

129

"critical and traditional part of politics in the United States" and (2) permitting judicial review of the procedure would result in the courts working an "unprecedented intervention in the American political process."

**2.      We Should Apply *Baker*'s Test to Decide Whether There Is a Judicially Manageable Standard Available to Review a Challenge to a Ballot-Order Scheme.**

The majority opinion errs in applying *Rucho* rather than *Baker* to determine whether there is a judicially manageable standard available to review a challenge to a ballot-order scheme. Allowing a federal court to review a state legislature's direction about how candidates should be ordered on the ballot does not give rise to the separation of powers concerns that led the Supreme Court in *Rucho* to apply a more rigorous test to determine whether there was a judicially manageable standard.

The Court's first justification for applying a more exacting standard in *Rucho* was that committing the drawing of electoral boundaries to the legislative process was a "critical and traditional part" of American politics. *Rucho*, 139 S. Ct. at 2498 (internal quotation marks omitted). In contrast, nothing in our country's history shows that committing the process of setting ballot order to the legislature is a critical and traditional part of American politics. The majority opinion recites a detailed history of the use of ballots in America. As this history shows, when paper ballots first came into use, individuals or organizations outside

130

the government, such as political parties, created the ballots. *See* Joseph P. Harris*,*

*Election Administration in the United States* 151 (1934). It was only in the late

nineteenth century, when states began adopting "Australian ballots," which

grouped the names of candidates beneath the office they were seeking, that state

legislatures took on the role of determining the order in which candidates should

appear on the ballot. *Id.* at 152–55.

Comparing the majority opinion's history of determining ballot order to the

history of drawing congressional districts as recounted by the Supreme Court in

*Rucho* makes the differences readily apparent. Unlike the drawing of political

districting lines, the setting of ballot order by state legislatures was not a practice

that existed in the colonies prior to American independence or was familiar to the

Framers. *See Rucho*, 139 S. Ct. at 2494–95. In modern American politics, of

course state legislatures play a role in determining ballot order through the passage

of statutes that dictate the procedures for ordering candidates' names on ballots.

*Rucho* tells us, though, that it is not enough that *today* state legislatures play a role;

rather, we must look back to see whether state legislatures have historically taken

on this role. The historical justification for applying *Rucho*'s stricter test is simply

absent here.

The Court's second justification for applying a more exacting standard in

*Rucho* was that allowing judicial review of partisan gerrymandering claims would

131

result in an "unprecedented intervention in the American political process" by the courts.  *Id.* at 2498 (internal quotation marks omitted).  But we have precedent for allowing judicial review of ballot-ordering practices because in *Mann* the Court left in place injunctive relief limiting a state official's power to determine ballot order.  398 U.S. at 955.  And there has been no decades-long unsuccessful struggle by the Supreme Court or other federal courts to review ballot-ordering schemes. *See Rucho* 139 S. Ct. at 2497–98.  To the contrary, courts have done just that.  *See McLain v. Meier*, 637 F.2d 1159, 1167, 1170 (8th Cir. 1980) (striking down North Dakota's ballot-order statute as unconstitutional).  Given the history of ballot-order litigation in the federal courts, I see no indication that federal court review of challenges to ballot-order laws would result in a never-before-seen extension of judicial authority.

Additionally, allowing courts to review challenges to state ballot-ordering schemes would not leave courts forever entangled and regularly reviewing how every state organizes its ballot.  Allowing judicial review of state ballot-order laws means that courts likely would review a state's ballot-ordering scheme only when the state legislature chose to adopt a new method,[23] and I see no indication that that happens frequently, in contrast to the necessity of redistricting as populations

---

[23] I note that in the decades since *Mann* affirmed a federal court injunction limiting a state official's practice for organizing candidate's names on ballots, there has been no deluge of cases challenging (and then re-challenging) how states order their ballots.

132

change.  The scope of federal judicial intervention thus would be vastly more limited than what the Supreme Court confronted in *Rucho*, where allowing federal courts to review partisan gerrymandering claims had the potential to create judicial intervention that "would be unlimited in scope and duration" whenever redistricting occurred.  *Rucho*, 139 S. Ct. at 2507.

According to the majority, "nothing in *Rucho* suggests" that its test for determining whether a judicially manageable standard is available should be applied narrowly.  Maj. Op. at 68.  But by not overruling *Baker* and explaining its reasons for adopting a more stringent test specifically in the partisan gerrymandering context, *Rucho* teaches that its heightened test for determining whether there is a judicially manageable standard should be used only when judicial review of the particular claim at issue would create separation of powers concerns akin to allowing courts to review the inherently and necessarily legislative process of drawing district lines.  We are not free to ignore the portion of *Rucho* where the Court explained **why** it applied a heightened standard.

Because the separation-of-powers concerns that led the Court to apply a heightened standard to determine whether was a judicially manageable standard in *Rucho* are simply not present here, *Baker*, not *Rucho*, establishes the proper test for deciding whether there is a judicially manageable standard available in this case.

133

### 3. Under *Baker*, There Is a Judicially Manageable Standard Available to Review a Challenge to a Ballot-Order Statute.

Applying the test from *Baker*, I would conclude that there is a judicially manageable standard available to review the Committees' challenge to the ballot-order statute as unconstitutionally burdening their First Amendment right of association. As I explained in Part I-A above, both the Democratic Party and the Committees enjoy rights to associate under the First Amendment. Yet, the Supreme Court has explained, these rights are not "absolute." *Burdick*, 504 U.S. at 433. Because the Constitution expressly permits states to set "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives," U.S. Const. art. I, § 4, cl. 1, the Supreme Court has recognized that states "retain the power to regulate their own elections." *Burdick*, 504 U.S. at 433.

When faced with a challenge to a state election law as impermissibly burdening First and Fourteenth Amendment rights, the Supreme Court has used the *Anderson-Burdick* framework to assess whether the law is unconstitutional. Under the *Anderson-Burdick* framework, a court identifies the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" and weighs this burden "against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434; *see Anderson*, 460 U.S. at 789. The "rigorousness" of a court's review "depends upon the extent to which" the

134

challenged law "burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. If the rights "are subjected to severe restrictions," the law "must be narrowly drawn to advance a state interest of compelling importance." *Id.* (internal quotation marks omitted). But if the state election law imposes "only reasonable, nondiscriminatory restrictions" upon the plaintiff's constitutional rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (internal quotation marks omitted).

A judicially manageable standard is available here because a court can use the *Anderson-Burdick* framework to review the Committees' right-of-association claim. We know this because the Supreme Court has in the past used the *Anderson-Burdick* framework to review claims that state election laws unconstitutionally burdened a political party's freedom of association. For example, in *Timmons*, the Court applied the *Anderson-Burdick* framework to review a political party's claim that Minnesota's anti-fusion law, which prohibited a candidate from being listed as the nominee for more than one political party, violated the party's First Amendment associational rights. *See Timmons*, 520 U.S. at 357–64. And in *Tashjian*, the Court used the *Anderson-Burdick* framework to review a political party's claim that a state law requiring voters to be registered members of a political party to vote in the party's primary violated the plaintiff's associational rights. *See Tashjian*, 479 U.S. at 213–17. Although these cases

135

considered First Amendment claims brought by political parties themselves, not their committees, their logic applies with equal force to the Committees in this case, for the reasons I explained above.

The majority opinion nonetheless contends that the *Anderson-Burdick* framework cannot be used to evaluate the Committees' claims because the framework can be used to review the constitutionality of "laws that burden voting rights" only. Maj. Op. at 50 (arguing that the *Anderson-Burdick* framework is used to evaluate "laws that burden voting rights"). This is simply not so. The Supreme Court recognized in *Timmons* and *Tashjian*, as well as other decisions, that courts can use the *Anderson-Burdick* framework to review constitutional challenges to election-related laws that burden the First Amendment right of association.

In one sentence, seemingly made in passing, the majority opinion surprisingly asserts that the ballot-order statute imposed no burden on any "associational rights." *Id.* at 51. I have already explained why I disagree with the majority's unreasoned assessment. The majority opinion's assertion is contrary to the district court's findings of fact, that as a result of the ballot-order statute, candidates from the governor's political party have received the top position on the ballot and been awarded a windfall associated with the primacy effect based solely on their party affiliation. Thus, Democratic candidates in Florida have been placed at an electoral disadvantage for the past 20 years. The majority's assertion is also

136

contrary to the legal principle—which has never been rejected by the Supreme

Court or any other federal court of appeals—that such a disadvantage burdens the

associational rights of a political party and the national committees through which

it operates by making it difficult for the party and its committees to raise funds,

register voters, attract volunteers, generate support from independent voters, recruit

candidates, and accomplish their policy objectives.  *See Gill*, 138 S. Ct. at 1938

(Kagan, J., concurring); *Cal. Democratic Party v. Jones*, 530 U.S. 567, 586 (2000).

In concluding that the ballot-order statute burdened no associational rights,

the majority opinion conflicts with decisions from other circuits that have reviewed

similar challenges to ballot-order statutes.  Although these courts came out

differently on the ultimate question of the constitutionality of the ballot order

schemes they were considering, their decisions uniformly concluded that ballot-

order statutes impose at least some burden on constitutional rights.  And that they

used the *Anderson-Burdick* framework to review such claims demonstrates that it

is available to review the claims in this case.  *See Pavek*, 2020 WL 4381845, at *1-

3 (concluding that a judicially manageable standard was available to review a

challenge to a ballot-order law and that it imposed some, albeit "minimal," burden

on the DSCC and DCCC's constitutional rights); *Libertarian Party of Va. v.

Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016) (concluding that Virginia's ballot-order

statute imposed some burden, albeit a "minimal" one, on the First and Fourteenth

Amendment rights of members of the Libertarian Party).[24]  As far I can tell, the majority opinion cites no case holding that such a law imposed ***no*** burden whatsoever on the right to vote or freedom to associate.  Unlike the majority, I would follow the decisions of our sister circuits and conclude that the *Anderson-Burdick* framework is available to review the Committees' challenge.[25]

The majority tries to justify its outlier position by claiming that a ballot-order law is a unique type of law "unlike any law that this Court or the Supreme Court has ever evaluated under *Anderson* and *Burdick*."  Maj. Op. at 50.  It is true that the Supreme Court has not yet applied the *Anderson-Burdick* framework to review a challenge to a ballot-order law.  But the majority performs a sleight of hand when it takes the fact that the Supreme Court has not ***yet*** decided a case about

---

[24] Several of our sister circuits considered challenges to ballot-order laws before the Supreme Court's decisions in *Anderson* and *Burdick*.  These decisions nevertheless recognized that ballot-order schemes imposed some burden on constitutional rights.  *See McClain*, 637 F.2d at 1167 (concluding that North Dakota's ballot-order law, which ordered candidates on the ballot based on how many votes their party received in the most recent congressional election, burdened constitutional rights); *Sangmeister v. Woodard*, 565 F.2d 460, 466 (7th Cir. 1977) (holding that practice of Illinois officials to give candidates from their party the top ballot position "worked a substantial disadvantage" to candidates from the opposing party, in violation of the Fourteenth Amendment); *see also Gould v. Grubb*, 536 P.2d 1337, 1343 (Cal. 1975) (recognizing that state law that awards top ballot order to a particular class of candidates "inevitably" burdens the rights of voters whose candidates are outside the class).

[25] For purposes of this dissent, I do not reach the merits of the Committees' challenge and take no position on whether the ballot-order statute is unconstitutional under the *Anderson-Burdick* framework.  My point here is more modest:  regardless of what the outcome of applying the *Anderson-Burdick* framework might be, we have a justiciable controversy because we can use that framework to review the Committees' challenge to the ballot-order statute.

138

whether the *Anderson-Burdick* framework applies to a challenge to a ballot order law to mean that the framework cannot apply to such a challenge.

Because the Committees established that they suffered some associational harm, the *Anderson-Burdick* framework is available to review their challenge to the ballot-order statute. Under the Supreme Court's decision in *Baker*, the fact that the *Anderson-Burdick* framework is available to review this type of constitutional claim is sufficient to establish the availability of a judicially manageable standard. *See Baker*, 369 U.S. at 226 (concluding that a judicially manageable standard was available to review a challenge to a state redistricting plan on the ground that the plan denied proportional representation because "[j]udicial standards under the Equal Protection Clause are well developed and familiar").

The majority opinion, relying on *Rucho*, also suggests that there is no judicially manageable standard because reviewing ballot-order schemes would require courts to decide questions of fairness and draw a line about how much partisan ballot-ordering is too much. The problem for the majority is that in *Rucho* the Supreme Court discussed these concerns in the context of applying a more exacting test to determine whether there was a judicially manageable standard.

139

The Court gave no indication that a court must look to these factors when *Rucho*'s heightened test does not apply.[26]

In any event, even if these concerns were relevant to the questions before us, I do not see how judicial review of a ballot-order scheme would pose the same difficulty with defining fairness or line-drawing that the Court faced in *Rucho*. I reach this conclusion based on a close reading of the portion of *Rucho* discussing fairness. There, the Court made clear that the problem with formulating a judicially manageable standard to evaluate a partisan gerrymandering claim was that there was no way for a court to review whether election boundaries were unconstitutional or to impose a remedy without making a political judgments about what interests should be prioritized in setting district boundaries. *See Rucho*, 139 S. Ct. at 2499–2500.

Let me explain in more detail. In *Rucho*, the Court observed that there were infinite ways district lines could be drawn and many priorities and interests to be

---

[26] Here, again, there is significant tension between the majority's application of *Rucho*'s test and *Mann*. Relying on *Rucho*, the majority argues that reviewing a ballot-order scheme requires a court to determine what "constitutes a fair allocation of the top ballot position" and that "picking among the competing visions of fairness" raises questions that are inherently political, not legal. Maj. Op. at 3. These are precisely the types of arguments that the Illinois secretary of state raised in *Mann* when he argued that the question of how a state organized its ballots did not "present[] a dispute within the judicial power" because it turned on "subjective . . . notions of political fairness." Jurisdictional Statement, *Mann*, 1970 WL 155703, at *21. Even assuming I am wrong that the Court's summary affirmance in *Mann* is binding, the fact that the Court was not persuaded by these arguments when it previously considered an appeal in a case challenging a ballot-order statute suggests that we should be skeptical of the arguments here.

weighed.  *Id.* at 2500.  The Court focused on three potential rubrics that courts could apply to decide whether a redistricting plan was "fair," explaining that a court could look to whether the districting map:  maximized the number of competitive districts, awarded each party an appropriate proportion of safe seats, or adhered to traditional districting criteria.  Under the first rubric, the Court explained, fairness would mean creating a "greater number of competitive districts."  *Id.*  This approach would seek "to undo packing and cracking so that supporters of the disadvantaged party have a better shot at electing their preferred candidates."  *Id.*  But an approach that maximized the number of competitive districts could be criticized as unfair because "making as many districts as possible more competitive could be a recipe for disaster for the disadvantaged party," as "even a narrow statewide preference for either party" could "produce an overwhelming majority for the winning party" in the legislature.  *Id.* (internal quotation marks omitted).

Under the second rubric, fairness would mean drawing district lines to "ensure each party its appropriate share of safe seats."  *Id.* (internal quotation marks omitted).  Under this approach, courts would prioritize drawing cracked and packed districts "to ensure each party its appropriate share of safe seats."  *Id.* (internal quotation marks omitted).  But an approach awarding each party a certain

141

share of safe seats "comes at the expense of competitive districts," so it, too, could be attacked as unfair. *Id.*

The Court addressed a third potential rubric for measuring fairness— considering "adherence to traditional districting criteria, such as maintaining political subdivisions, keeping communities of interest together, and protecting incumbents." *Id.* (internal quotation marks omitted). But even focusing on adherence to traditional criteria would not be politically neutral. After all, protecting incumbents would "enshrine a particular partisan distribution." *Id.* And keeping communities of interest together or maintaining political subdivisions could mean respecting the fact that "urban electoral districts are often dominated by one political party." *Id.* Such an approach could "lead to inherently packed districts." *Id.* Another traditional districting criterion would be seeking to preserve "compactness or contiguity" in political districts. *Id.* But a decision under this standard "would unavoidably have significant political effect, whether intended or not." *Id.* (internal quotation marks omitted).

After exploring the problems inherent in deciding what would be fair in this context, the Court explained that to review a partisan gerrymandering claim, a court would need to decide among "different visions of fairness." *Id.* But this decision was necessarily "political, not legal." *Id.* There was no "limited and

142

precise standard[]" available that was "clear, manageable, and politically neutral" to guide a Court in selecting among them. *Id.*

The Court went on to say that even if a court was able to select among these competing versions of fairness, it then would have to answer an even more difficult question: "[h]ow much is too much?" *Id.* at 2501. To answer this question, the Court would have to identify the point at which "permissible partisanship become[s] unconstitutional." *Id.* In drawing this line, the Court explained, it would again be making a political, not legal, decision.

The Court referred back to the three different conceptions of fairness to show that a hypothetical court applying any of the rubrics would have to engage in line-drawing untethered to any legal standard to determine whether a particular districting plan was an unconstitutional partisan gerrymander. If a court used the first rubric and sought to maximize the number of competitive districts, it would need to determine how close the split between parties needed to be for a district to be competitive. And if it were impossible to draw boundaries to make every district competitive, how would a court decide which districts to make competitive? *Id.*

If a court applying the second rubric and focused on guaranteeing each party a certain proportion of safe seats, it would face similar line-drawing problems. If an allocation of five seats to one party and three seats to the other corresponded

143

most closely to statewide voting totals, the Court asked, would a six to two allocation be permissible? And to ensure this distribution of seats, how would a court determine "[w]hich seats should be packed and which cracked?" *Id.*

Likewise, the Court identified difficulties with applying the third rubric, which prioritized "traditional" redistricting concerns. Say a redistricting plan "protected half of the incumbents but redistricted the rest into head to head races, would that be constitutional?" *Id.* Because voters concentrated in urban areas tended to be aligned with the Democratic Party, the Court asked whether a court considering traditional redistricting concerns would have to "reverse gerrymander other parts of the State" to "counteract natural gerrymandering" that resulted from the urban concentration of Democratic voters? *Id.* (internal quotation marks omitted). If a court tried to adhere to traditional criteria, it would have to "rank the relative importance of [the] traditional criteria and weigh how much deviation from each to allow." *Id.* The Court concluded that there was no test available that provided a "solid grounding for judges to take the extraordinary step of reallocating power and influence between political parties." *Id.* at 2502.

A court does not face the same difficulties in reviewing a challenge to a ballot-order law or granting relief in such a case. It is easy to organize a ballot by ordering the candidates on a basis other than political affiliation. When the candidates' names appear on the ballot in alphabetical order or based on drawing

144

lots, the windfall associated with the primary effect is allocated to no candidate based on political affiliation. *See Mann*, 314 F. Supp. at 679. Any system that orders candidates on a basis other than party affiliation remedies the constitutional concern. Period—end of story.

After identifying four potential ways[27] of ordering candidates' names on ballots, the majority opinion says that deciding among these methods would require a court to make political judgments. But the majority discusses only potential ballot-organization methods that establish ballot order with reference to candidates' political affiliation. By failing to consider methods such as listing names in alphabetical order or by random draw, the majority blinds itself to the possibility that a state can organize its ballots without any reference to political affiliation whatsoever, thus removing party politics from the ballot-ordering equation entirely.[28]

---

[27] The four methods for ordering ballots that the majority discusses are: (1) alternating the name of the candidate appearing first for each office so that the Democratic candidate's name appears first on half the ballots and the Republican candidate's name appears first on the other half; (2) alternating the name of the candidate appearing first for each office so that each candidate running for office, regardless of political party, appears first on an equal number of ballots; (3) alternating the name of the candidate appearing first for each office so that each candidate appears first on a share of ballots equivalent to the proportion of voters in the state who belong to her political party; or (4) listing first the candidate for each office whose political party received the fewest number of votes in the last election.

[28] The only time that the majority mentions a "neutral" method for assigning ballot position—setting ballot order randomly or alphabetically by last name—is to point out that the Arizona Supreme Court held these methods of ordering unconstitutional under Arizona's state constitution. *See* Maj. Op. at 64 (citing *Kautenburger v. Jackson*, 333 P.2d 293, 294–95 (Ariz. 1958). But the Arizona Supreme Court's recognition that a unique provision of Arizona's constitution required the state to organize its ballots so that all candidates appeared first on an

Because it is possible to organize ballots without basing the organization on a candidate's political party, the question of how to order a ballot is nothing like deciding which values to elevate other others in making districts more "fair," whether to draw a boundary around this neighborhood or that one, or making the thousands of tiny judgment calls that drawing political districts requires. And unlike drawing districts, ordering ballots is not a zero-sum game: with a system that is not based on party affiliation, one party's associational rights do not have to lose out to another party's.

The majority opinion also insists that there can be no judicially manageable standard unless we can know now—*before* evaluating the merits of the plaintiffs' claims—the precise point at which allocating the primacy effect based on party affiliation crosses a constitutional line. *See* Maj. Op. at 55 ("[H]ow large must the primacy effect be to create a constitutional problem? Two percent of voters? Five percent? Some greater share?"). The only case that arguably supports requiring a plaintiff to answer these questions as a part of establishing that there is a judicially manageable standard is *Rucho*. If I am correct that *Rucho*'s exacting standard does not apply here, then we need not make those decisions at this stage.

---

equal number of ballots in no way suggests that in reviewing a federal constitutional claim we can ignore the fact that Florida could order candidates based on alphabetical order or random draw.

*Baker* instead makes clear that the answer to this question is not necessary to find a judicially manageable standard.  In *Baker*, the Court concluded that there was a judicially manageable standard without articulating the precise degree of population variation in districts that would give rise to a constitutional violation. Instead, the Court left the question of identifying that threshold for future cases, when the Court reached the merits of claims challenging particular apportionment plans.  *See, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 727 (1983) (concluding that reappointment plan for congressional districts was unconstitutional where population of largest district was less than one percent greater than population of smallest district because the population deviations were not the result of a good-faith effort to achieve population equality); *Gaffney v. Cummings*, 412 U.S. 735, 751 (1973) (concluding that there was no prima facie case of invidious discrimination where districting map for state legislature created districts that varied in population by a maximum of less than eight percent for state house and less than two percent for state senate).[29]

---

[29] The majority opinion advances one final argument that is so weak it hardly merits any discussion.  The majority opinion points out that in the absence of a Supreme Court case explaining how to review challenges to ballot-order laws, lower courts have applied "different and sometimes contradictory standards."  Maj. Op. at 64.  The majority opinion treats the tension among these decisions as evidence that there is no judicially discernible or manageable standard for reviewing a challenge to a ballot-order scheme.  These two things are apples and oranges.

Under the majority's reasoning, any time lower courts were divided about how to review an election law claim a court would have to throw up its hands and conclude that there was no judicially manageable standard and so the claim presented a nonjusticiable political question. Unsurprisingly, the majority opinion cites no authority holding that a judicially manageable

147

To sum up, we have a constitutional "responsibility to decide cases properly before" us. *Zivofotsky*, 566 U.S. at 194; *see Cohens*, 19 U.S. (6 Wheat) at 404. It is true that the political question doctrine creates an exception to this general rule. But the Committees' challenge does not pose a political question. As an initial matter, the Supreme Court's decision in *Mann* established that there is no political question before us because in that case the Illinois secretary of state raised—and the Court necessarily rejected—the argument that a challenge to a ballot-order statute raises a nonjusticiable political question. By refusing to follow *Mann*, the majority opinion also refuses to adhere to Supreme Court precedent telling us how to treat its summary decisions.

Even if *Mann* did not answer the question before us, I still would not join the majority opinion. I am far from persuaded that the more exacting standard the Supreme Court applied in *Rucho* to determine whether there was a judicially manageable standard should be applied in the case before us, given two things. First, the role of state legislatures role in setting the order of candidates' names on ballots is not a critical and traditional part of politics in the United States because there is no history dating back to the nation's founding, as there is with partisan gerrymandering. Second, not only has the Supreme Court previously struck down

---

standard is unavailable because lower courts have not uniformly agreed on how to resolve the claim.

148

a ballot-order scheme as unconstitutional, but it also has no cases suggesting a challenge to a ballot-order scheme is nonjusticiable. Because allowing courts to review challenges to ballot-order laws does not implicate the separation of powers in the same way that partisan gerrymandering claims do, *Rucho*'s test does not apply here. By applying *Rucho*'s test to determine whether there is a judicially manageable standard in this case, the majority stretches the political question doctrine dangerously beyond the boundaries set by the Supreme Court and ignores the factors the Court used to distinguish partisan gerrymandering claims from other types of election-related challenges.

Looking to the test from *Baker*, I would conclude that a judicially manageable standard is available here because we can use the well-established *Anderson-Burdick* framework to review the Committees' challenge to the ballot-order statute. Because the Committees' challenge does not raise a political question, I would hold that we have jurisdiction and, indeed, an obligation to address the merits of the Committees' claims.

### III.

The committee plaintiffs have standing, and their claims are justiciable. Because we have jurisdiction to review their claims, we should address the merits of this case. In its four alternative holdings, the majority opinion (unnecessarily, I might add) announces new law about when a political party and its committees

149

suffer (and do not suffer) injuries, when an injury related to the enforcement of an election statute is traceable to a secretary of state who serves as the top elections official in the state, when an injury related to the enforcement of an election statute is redressable against a secretary of state, and finally when a challenge to an election law raises a political question that the courts cannot even review.  Because the majority opinion's analysis as to each issue is flawed, the opinion introduces error upon error upon error into our precedent and makes us an outlier among the federal circuits.

The issues that the Court decides today are not merely academic questions. Today's decision will make it harder for future plaintiffs subjected to unconstitutional election-related laws to have their claims heard in federal court.  If a national political party or its committee sues to challenge an election-related statute claiming an associational injury, today's decision likely will compel the court to dismiss the case because the party and its committee experienced no injury in fact—even when the challenged practice harmed the prospects of the party's candidates; weakened the strength of the party; and made it more difficult for the committee to fundraise, register voters, attract volunteers, generate support from independents, recruit candidates for office, and accomplish its policy objectives.

But the majority opinion does not stop there.  The majority errs not only in limiting who can sue to challenge an election law but also limiting when a

150

secretary of state can be named as a defendant in a suit challenging an election law. Even when a future litigant can establish that she experienced an injury in fact, the majority opinion may make it impossible for her to prove that her injuries were traceable to a secretary of state or redressable in litigation against the secretary. Under the majority's decision today, if a local elections official also plays a role in implementing the statutory scheme, the secretary of state may be able to argue that she lacks a sufficient connection to the challenged policy and avoid suit, even when she plays a significant role in enforcing the law.

Yet the majority opinion does not stop there. Even if a plaintiff sues only local elections officials and not the secretary of state, a federal court may refuse to address the merits of her claim on the basis that she has raised a nonjusticiable political question. The majority's unwarranted extension of the political question doctrine causes it to abdicate without justification our constitutional duty to decide cases and controversies that are properly before us.

It is true that in *Rucho* the Supreme Court held that partisan-gerrymandering claims raised a nonjusticiable political question. But the Court reached this conclusion by applying a more exacting test to determine whether there was a judicially manageable standard specifically to review partisan gerrymandering claims. The Court's decision to apply the heightened standard was based on its concern over the particular separation of power issues that would arise from

151

federal court review of the legislative process of drawing district lines for partisan reasons.  By applying *Rucho*'s searching standard when these same separation of powers concerns are absent, the majority opinion broadens the reach of the political question doctrine, rendering unreviewable constitutional claims that can and should be resolved by federal courts.  These are grave mistakes that portend dark days for the Constitution and the fundamental rights it guarantees.  I hope that our en banc Court or the Supreme Court will step in to correct the majority's mistakes and preserve the federal judiciary's vital role in protecting constitutional rights in the context of elections.

I dissent.